CMI, INC.

v.

**INTOXIMETERS, INC., et al.**

**Civil Action No. C93–265–L.**

United States District Court,
W.D. Kentucky,
Louisville Division.

Nov. 16, 1995.

---

J. Bruce Miller, Anthony L. Schnell, Louisville, Kentucky, for plaintiff.

Charles J. Cronan, IV, Stites & Harbison, Louisville, Kentucky, Wilbur L. Tomlinson, Armstrong, Teasdale, Schlafly & Davis, St. Louis, Missouri, Patrick W. Michael, Kenneth L. Anderson, Woodward Hobson & Fulton, Louisville, Kentucky, for National Patent Analytical Systems, Inc.

## MEMORANDUM OPINION

HEYBURN, District Judge.

The Court bifurcated this case and in the summer of 1994 tried the patent validity and infringement claims. *See CMI v. Intoximeters*, 866 F.Supp. 342 (W.D.Ky.1994). CMI's remaining common law claims of unfair competition include separate counts for (1) tortious interference with contractual relations; (2) tortious interference with prospective business advantage; (3) tortious defamation of business reputation; (4) intentional misrepresentation or fraud; (5) injurious falsehood; and (6) RICO. As to each cause of action, CMI makes claims against Intoximeters, Inc., Macq. Forrester ("Forrester"), Glenn Forrester, Rankin E. Forrester, National Patent Analytical Systems, Inc. and John D. Fusco. From the first trial, the

Court reserved several issues: (1) whether Intoximeters misused its patent and (2) whether this case was an "exceptional" one which warranted the award of attorneys' fees. All of the parties to these remaining claims have filed dispositive motions.

Consequently, the Court must consider under these facts the full array of business tort claims now sanctioned in Kentucky and must predict whether Kentucky courts would adopt others proposed by CMI. The Court released this Memorandum Opinion in draft prior to issuing this final version. The results of that conference are on the record and, in the Court's view, reflect favorably upon the correctness of the Court's conclusions.

For the reasons set forth in this Memorandum Opinion, the Court will dismiss each of CMI's common law and RICO claims.

## I.

From a thorough review of the record, the Court now summarizes comprehensively the material facts from which a reasonable jury might conclude Defendants' liability under the Second Amended Complaint.

In August 1991, Robert Walsh was selected to serve on an evaluation committee to oversee the selection and purchase of breath alcohol analyzer instruments for Missouri. On August 26, 1991, he published a newsletter making positive comments concerning CMI's Intoxilyzer 5000. At this point Intoxilyzer 5000 was not a dry gas calibration instrument and was entirely different from the instrument that CMI ultimately provided the State of Oregon, which is now the subject of this lawsuit. After publication of this newsletter Walsh received a phone call from Cliff Broeder of National Patent to complain about the newsletter's comments. Broeder thought the comments showed Walsh was biased. Thereafter, certain other Missouri officials, after receiving phone calls from Broeder, removed Walsh from the evaluation committee due to his perceived bias.

In the spring of 1992, Missouri solicited its first bid for breath alcohol testing equipment. CMI was the only bidder. Its bid was rejected as non-conforming. On May 13, 1992, Fusco of National Patent wrote Missouri officials to criticize the "absurd requirements" for bidding that eliminated all the bidders but one. He made no comment about CMI or its products.

On July 20, 1992, Oregon issued its invitation to bid for breath alcohol testing instruments, requiring dry gas calibration and a cool infra-red detector. The invitation also required a patent infringement waiver.

On July 29, 1992, Forrester (Intoximeters) sent a letter to Braswell (CMI) with a copy to Oregon officials. The letter states Forrester's understanding that the Oregon specifications call for "a breath alcohol analyzer using an IR cell that is adapted to be calibrated or standardized with a dry gas alcohol sample." The letter calls everyone's attention to the Intoximeters' patent "418" and says that if CMI uses the dry gas alcohol standard it will undoubtedly infringe upon the "418" patent. Apparently, CMI did not first become aware of the "418" patent until July 29, 1992. On July 30, 1992, CMI responded that it did not intend to infringe upon the "418" patent.

On September 25, 1992, Oregon awarded the contract to CMI. At the state's request, CMI agreed to indemnify Oregon for any patent infringement claim.

In the fall of 1992, Forrester and Fusco attended the "T–92" conference in Cologne, Germany. Although no direct evidence of what was said at the conference exists, Forrester is alleged to have made numerous comments to Robert Dutkosky (CMI) warning him that Intoximeters would get "just compensation." Fusco is alleged to have made similar comments.

On October 5, 1992, Forrester corresponded to Oregon officials. He stated that

> Intoximeters holds the "418" patent which "governs the use of the 'dry gas' standard with an infrared breath tester. CMI, the manufacture of the Intoxilyzer, is not licensed to use this patent and therefore I request that you do not implement the use of 'dry gas' in your program ... as you will appreciate, our quarrel is not with Oregon, but with CMI, which bid to supply equipments specifically designed to carry out an infringing process without our au-

thority; nor are we trying to preclude Oregon's use of the process.

The letter seems to take the position that the Oregon bid specifications required the use of the Intoximeters' patented process. Paragraph 3 of the letter makes it clear that Intoximeters has not yet determined for itself whether Oregon is using the patented process and that it may take legal action to make that determination.

On October 6, 1992, Fusco wrote Byron Thompson (Oregon) to notify formally the State of the State's obligations under the bid documents. On October 6, 1992, Fusco wrote Byron Thompson formally to protest the bid award. This letter is more in the nature of a formal protest of CMI's failure to comply with the "infringement waiver" provision of the bid documents. On October 8, 1992, Thompson wrote to Fusco denying National Patent's bid protest as being untimely.

On October 8, 1992, CMI's patent attorney, King, wrote to Richard Johnson (CMI) confirming that he "authorized the use of an aluminum cell with a polished interior to avoid patent infringement." This may indicate the date on which CMI firmly decided on the make-up of the new Intoxilyzer 5000.

On October 12, 1992, interoffice memo re CMI Intoxilyzer 5000 project stated, "Testing has been done on a sample cell that is all aluminum as opposed to being nickel plated. Results are good and all aluminum cells will be used in the first 20 instruments [in Oregon] we think that this will avoid any patent infringement issue. The light anodize cell will also be tested as a possible long term solution." This suggests that around the first part of October CMI settled upon a non-infringing metal for the new Intoxilyzer 5000.

On October 13, 1992, Schofield (CMI) wrote to U.S. D.O.T. regarding changing from nickel plating to an aluminum cell. On October 15, 1992, CMI informed Forrester for the first time that it would use an untreated aluminum cell. On the same date, Forrester called the U.S. D.O.T. to inform the D.O.T. of the patent dispute and told it that CMI's instrument may fail.

On October 16, 1992, Forrester made comments to Missouri representatives at pre-bid conference regarding the patent dispute. The exact nature of the comments is not clear. Allegedly, Meyers (CMI) states that CMI would not be using pure untreated aluminum IR cells. All of this seems to highlight the debate going on between the two companies as to whether the use of untreated aluminum cells would produce valid results. Intoximeters believed that valid results could not be obtained through the use of untreated aluminum cells while CMI believed that valid results were obtainable by this method.

On October 19, 1992, Forrester is described as communicating with Dr. Flores (U.S. D.O.T.). Forrester stated that he believed if CMI implanted pure aluminum sample chambers in the Oregon unit, then CMI would circumvent Intoximeters' patent. He also stated that if this implant is done, then units will be significantly different from what was evaluated by the state and D.O.T. As a result, he requested the D.O.T. to evaluate the unit over a period of time long enough to assess the aluminum oxide problem. The U.S. D.O.T. did not receive its first aluminum cell dry gas calibration Intoxilyzer 5000 until November 1993. Apparently, Forrester's efforts did not cause U.S. D.O.T. to reevaluate the new Intoxilyzer 5000, remove it from the approved products list, do anything or say anything to anyone.

On November 11, 1992, Forrester wrote to Thompson (Oregon) enclosing a copy a letter from Intoximeters' patent attorney, Polster, dated the same date. Polster's letter sets forth Intoximeters' theory of infringement. It states:

I realize that CMI has represented that its chamber is made of untreated 6063 aluminum. If the surface in fact untreated, it will have a coating of aluminum oxide, which your experience indicates will adsorb alcohol disproportionately from a dry standard, leading to erratic results as is explained in the specification of the patent, but not to infringement. If it is treated to make the surface nonadsorbent, then the method of standardization will be accurate, but it will infringe. Perhaps the State of Oregon will permit you to run

tests preliminarily to determine if the chamber surface is adsorbent.

Polster's letter raises two unknowns: whether the surface of the chamber of the CMI machine is non-adsorbent and whether the CMI machine is standardized, calibrated or tested by the use of a dry gas sample. As the first trial revealed, the chamber surface was in fact made of untreated aluminum and therefore was not infringing upon the "418" patent. However, on November 11, Polster may have had no reason to know this. Polster merely gave an opinion about the erratic results.

On December 2, 1992, Thompson wrote to Intoximeters stating that it does not consider the cell in violation of the patent and that the machine supplied by CMI will be calibrated by a dry gas standard. On December 3, 1992, Johnson (CMI) wrote to Forrester. He reasserts his opinion that

> the method of using a dry gas standard for calibration of the breath analyzer is dedicated to the public ... the IR cell used in the Intoxilyzer 5000 for the State of Oregon is constructed out of untreated 6061 aluminum. There is no treatment in any form applied to the interior surface of the IR cell....

He also says that extensive testing shows no change in performance of the instrument. CMI sends one-half of unplated aluminum IR cell to Intoximeters for inspection.

On December 7, 1992, Forrester responds to Thompson. Forrester simply reiterates his disbelief that the chamber is untreated. He says "I must conclude that the chamber material is treated." Most important, Forrester goes on to state that "our patent clearly covers the use of a dry gas standard with non-absorbent chambers in infrared breath testing instruments." This is an overly broad statement of the patent's scope. His assumption about the type of aluminum used turned out to be untrue. Forrester requests access to two chambers so that testing could be done by an "independent out of state metallurgist to establish their makeup." He finally states that "our desire is to correct a mistake that has apparently been made through an attempt to avoid a legal patent." This is an unclear statement to say the least.

On December 14, 1992, Fusco wrote Forrester to discuss his view that the use of the untreated aluminum IR cells is not "serviceable to the customer." The letter is presented as evidence of concerted action to convince someone that the utilization of the untreated cell with a dry gas standard "will not work." The letter contains the following statement:

> We did not use a type 6061 aluminum alloy and I would prefer to keep the type we use confidential. As you know, type 6061 is not a good choice from a number of standpoints, including the fact that it will oxidize an ambient air. We do use a clear anodized, treated after extruding and before machining. We do this because untreated aluminum rapidly oxides and stains in the cell causing an unacceptable loss of efficiency and offers little chance to clean or restore the cell ... the cell I have sent you is about seven-years old. You will note that the main body of the cell is reasonably clean and reflective, considering the age. The scratches are from improper cleaning at some point. Note however, the ends of the cell where the light passes at a 90 degree angle to the horizontal passages. This part is machined after anodizing and exhibits the characteristic frosty appearance of oxidation.

Fusco seems to be saying that anodization is the key to an aluminum alloy which does not adsorb. Interestingly, Fusco would not want to disclose to Forrester the exact type of aluminum alloy. CMI contends that Fusco had no basis for making the statements contained in the letter and did no testing on extruded aluminum and merely adopted Forrester's comments. This letter was not sent to Oregon officials.

CMI alleges that during 1992 and 1993, the Forresters admitted to having fourteen (14) separate conversations in which Forrester is said to have criticized the Intoxilyzer 5000. These statements are referenced in CMI's Memorandum dated September 27, 1995 at pages 10–11 (Docket No. 237). The Court has reviewed each of these interrogatories and concludes that they do not constitute "admissions" nor can they be fairly charac-

terized in the manner suggested by CMI. Rather, most of these interrogatories describe, in a general way, conversations with various state officials concerning the use of a dry gas standard with a pure untreated aluminum cell and whether such use would produce consistent results. Some reference the ongoing disagreement about this subject between CMI and Intoximeters. Others reflect conversations where officials queried whether their problems with CMI instruments could be related to this ongoing dispute between the two companies and described Intoximeters' belief that the use of a dry gas standard with the Intoxilyzer 5000 could potentially create patent problems. None of the interrogatories support the proposition that Intoximeters claimed that CMI's Intoxilyzer 5000, when used with a dry gas standard, infringes upon the "418" patent. Nor is there anything resembling the proposition that the Intoxilyzer 5000 will not work if it does not infringe, or in other words, does not use an extruded aluminum cell.

In early 1993 Missouri solicited bids for testing equipment. CMI was the sole bidder. Missouri rejected its bid as failing to meet bid specifications.

On February 25, 1993, Forrester wrote to Doug Marshall (Oregon) regarding CMI's patent infringement. Forrester asked that the state intellectual property office investigate whether the State of Oregon has infringed the "418" patent. On March 1, 1993, Intoximeters patent counsel, Polster, wrote the State of Oregon. Polster's letter merely restated the previous arguments about either infringement or the unreliability of the Intoxilyzer 5000. He also said that

CMI has asserted that the chamber is nonadsorbent. If that is true, its use with the dry gas standards is an infringement of the Intoximeters' patent. If it is not true, then the State of Oregon would seem to be a party to a deception that is likely to discredit the entire breath alcohol testing program, as defense attorneys begin to realize what is happening.

Polster's conclusions about the infringement are at odds with the Court's findings.

On March 25, 1993, the International Association of Chemical Testing ("IACT") Confer-

ence convenes in Louisville. At the conference Fusco discussed CMI instruments with Michael Hurley (Oregon). CMI alleges that Fusco called the instrument a "monstrosity" and said that the instrument was the "butt of several jokes." Glen Forrester (Intoximeters) gave technical discussion at the conference regarding the two prevalent analytic methods used for calibration of alcohol breath. In this discussion Glen Forrester commented on the problem that adsorption in IR cells and how this may produce erratic results. He did not specifically mention any product, but simply discussed the problem.

On March 29, 1993, Fusco wrote to Oregon questioning CMI's contract compliance. This letter began by stating that there was some speculation that the International Association of Chemical Testing Conference regarding whether the Intoxilyzer 5000 met generally accepted industry standards for material selection and construction. It questioned whether CMI was complying with the bid specification and asked the State of Oregon to provide certain information "so that we can make a determination of bid compliance." The letter appears to be a carefully stated request for information rather than directly accusatory. The State of Oregon did not give it much consideration, dismissing it with a terse response on April 19.

On April 13, 1993, Forrester wrote to Captain Brooks (Oregon) restating the debate that occurred at the IACT Convention to the effect that

raw untreated aluminum will not violate the patent but that in Intoximeters' experience it will cause problems with the performance of the instrument.

In addition, Forrester stated that

if your results are consistent, it would be our contention that the sample chambers were not aluminum as CMI claims, and that we would wish to arrange to inspect a unit in your presence as outlined in our letter of December 2, 1992. If the surface of the CMI cell supplied to Oregon proved to have been treated to make them nonadsorptive or the cells prove to be a nonreactive material, different from aluminum, In-

toximeters would take whatever action it sees fit against the State of Oregon.

In early September 1993, Forrester is alleged to have called George Menart (Wisconsin) to state that the CMI equipment infringed on the "418" patent if it were calibrated with the dry gas standard and that the instrument would not work if it utilized an unplated aluminum cell with the dry gas standard.

On September 7, 1993, Forrester spoke with Tom Getske (Wisconsin) regarding Intoximeters' intention to sue the State of Wisconsin, if the State used machines which incorporate a patented process. The letter did not directly accuse CMI of anything. On September 7, 1993, Sobitik (Assistant General Counsel, Wisconsin Dept. of Transportation) responded that "as I understand it, your company is threatening the Division of State Patrol with a lawsuit if it uses Intoxilyzer breath analysis machines that incorporate a breath analysis process patented by your company." Sobitik asked whether Forrester had any authority for obtaining an injunction. On September 7, 1993, Sobitik wrote Thomas Meyer (CMI) that "we will be making a decision on whether WISDOT will continue to use your machines in the near future." Sobitik enclosed a copy of his response to Forrester. He asked for any legal authority as to whether WISDOT will be liable in the event of a patent infringement.

On September 17, 1993, Forrester wrote Sobitik and enclosed a copy of the "418" patent. The letter states in part:

> Since the patent in question deals with the use of a dry gas standard in a nonabsorbent IR cell, the sale or manufacture of breath alcohol detection equipment with a nonabsorbent IR cells is not, in and of itself, an infringement. It is only when that instrument utilizes dry gas calibration that infringement can occur. That is why we indicated that Wisconsin needs to make an analysis of the facts to assert whether infringement will occur if it is intended to use the dry gas standard.... "the answer to that question [whether there is infringement or not] may vary based on model and date of manufacture. Again, that is why we sought clarification of the type of equip-

ment Wisconsin intended to use with the dry gas standard."

On September 30, 1993, Forrester spoke by phone with Sobitik. Sobitik said that Forrester was very rude. Wisconsin continued to evaluate the breath testing machines. On October 4, 1993, CMI agreed to indemnify and hold harmless Wisconsin for any claims arising out of any alleged patent infringement.

The only other contact with Wisconsin occurred almost a year later, on August 12, 1994. At that time, Forrester attempted to have a correspondence with George Menart of the Wisconsin State Patrol regarding the litigation between CMI and Intoximeters. State of Wisconsin rules prohibit such contacts. Consequently, Sobitik called Wilbur Thompson (Intoximeters' attorney) to advise him that such contacts were not allowed and the State of Wisconsin would treat both CMI and Intoximeters as fairly as possible.

On April 5, 1994, State of Missouri issued its third invitation for bid for breathalyser equipment. Both CMI and National Patent submitted bids. National Patent was the low bidder and was awarded the contract.

## II.

This Court must reflect upon its first Memorandum Opinion and Order in this case. *CMI v. Intoximeters, supra.* The primary purpose of that Memorandum Opinion was to explain the Court's reasons for granting summary judgment to CMI on its request for a declaration of noninfringement. The Court also concluded that CMI is not entitled to judgment that the "418" patent is unenforceable due to inequitable conduct. The Court reserved a ruling on whether CMI was entitled to relief based upon patent misuse and whether CMI was entitled to attorneys' fees pursuant to 35 U.S.C. § 285.

In the process of doing all this, the Court commented upon the evidence as it existed at that time, and, more important, as it related to specific patent issues before the Court. To a limited extent the Court wished to foreshadow some of the issues in the second phase of the trial. However, the Court's comments must be considered in their proper

context. They were made without reference to the elements required for any remaining common law causes of action. The Court's statements represent its consideration of patent related issues only, not the common law questions now at issue. Irrespective of the any stated opinion about the facts on patent issues, the Court cannot conjure up causes of action to fit those facts.

If it is true that one of Intoximeters' statements was "absolutely untenable," that fact is relevant only as to some of the elements in the common law issues. But those facts are not dispositive of all the required elements. For example, to label conduct potentially "anticompetitive" does not predetermine that the conduct caused any actual damages. Many of the Court's other comments concern Intoximeters' apparently mistaken belief that extruded aluminum would not produce adequate results and its expansive legal view of its own patent. These opinions, even if true, do not fully resolve all the elements of any remaining common law issues in the case.

The Court does not view its opinions concerning patent issues to be irreconcilable in any respect with dismissal of the pending common law claims.

### III.

■ A federal court sitting in a diversity action must apply the substantive law of the state in which it sits. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938). In this case, unfortunately, no Kentucky court has comprehensively addressed all of the various torts asserted here. It is this Court's duty, therefore, to decide unsettled issues of state law as a Kentucky court would decide them. *Overstreet v. Norden Laboratories, Inc.,* 669 F.2d 1286, 1290 (1986). To do so, the Court must predict how our state courts would rule.

In construing a motion for summary judgment, a Court must determine whether the moving party has met the initial burden of showing that there is an absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). The inquiry on summary judgment centers on whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it

is so one-sided that one party must prevail as a matter of law." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). Thus, the non-moving party, Plaintiff here, must proffer evidence that points to disputes of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

CMI has had every opportunity to place in the record all the facts which may tend to prove unlawful actions by Defendants. The Court has set forth in detail those facts which are material. No party has seriously questioned the accuracy or completeness of that summary. The Court now judges the sufficiency of the complaint on those facts.

### IV.

The issue of damages is central to the Court's consideration of this case. Indeed, it is the precise character of CMI's damages, if any, which decides several of the issues before the Court. For that reason, it will be helpful to make a few comments now.

Earlier this year, CMI expressly limited its claims of lost contracts to four jurisdictions; the states of Oregon, Wisconsin, Missouri and the country of Australia. For reasons more clearly explained later in this Memorandum Opinion, CMI has shown no evidence of actual damages within any of these jurisdictions. In fact, it must be said that CMI has presented no proof that remotely links a lost sale to an action by Defendants. The Court has focused its attention on evidence of lost business for the Intoxilyzer 5000. No other market or product would appear to be relevant in this case.

■ For obvious reasons, CMI then retained the services of Dr. Douglas V. Austin to analyze CMI's financial reports and those of Intoximeters to give an opinion as to CMI's actual damages caused by the actions of Intoximeters and National Patent. The Court has thoroughly examined Dr. Austin's proposed testimony and finds that it completely fails to suggest any damages within a reasonable degree of certainty.

Although CMI cannot identify a single specific lost customer or sale due to Defendants' actions, Dr. Austin "infers" a causal relation-

ship between Defendants' increased profits and CMI's decreased sales. Among other things, Dr. Austin fashions a theory of "unjust enrichment" from these facts as well as from a comparison to overall industry performance. These theories have dubious legal value. More important, they are entirely and unacceptably speculative.

No one has disputed Dr. Austin's expertise. However, there is no foundation upon which Dr. Austin can conclude that any of CMI's financial results—either good or bad—have any causal relationship with actions by Intoximeters or National Patent. Dr. Austin's opinion is so clearly lacking this essential element that very little needs to be said. Under no circumstances could this Court allow a jury to consider opinions that, due to the absence of foundation or reasonable causal connection, amount to no more than sheer speculation.

## V.

■ Since 1930, Kentucky has evolved from limited acknowledgment of business torts to support for business torts in certain well-defined circumstances. *See Brooks v. Patterson*, 234 Ky. 757, 29 S.W.2d 26 (1930); *Derby Road Building Co. v. Commonwealth*, Ky. 317 S.W.2d 891 (1958). Finally, in *Carmichael–Lynn–Nolan, etc. v. Bennett, etc.*, 561 S.W.2d 99 (Ky.App.1978) the Kentucky Court of Appeals set forth the principles governing the tort of intentional interference with contractual relations. The court stated that § 766 of the *Restatement (Second) of Torts* provides the correct guidelines. *Id.* at 102[1] In essence, to recover under this specific theory, CMI must prove the following elements: (1) the existence of a contract; (2) Defendants' knowledge of this contract; (3) that it intended to cause its breach; (4) its conduct caused the breach; (5) this breach

resulted in damages to CMI; and (6) Defendant had no privilege or justification to excuse its conduct.

■ At a minimum, to be actionable, CMI must show that a contract existed between it and a third party followed by a breach by the third party. *Industrial Equipment Co. v. Emerson Elec. Co*, 554 F.2d 276, 289 (6th Cir.1977). Theoretically, such circumstances might exist only in Oregon or Wisconsin. However, CMI concedes that it cannot prove the requisite breach of contract in either of these states or as to any other contracts. Thus, CMI's claim fails in an essential element of the cause of action.

■ Consequently, CMI urges this court to recognize a variation of this specific tort: intentional interference with the plaintiff's own performance of its contract. Citing no case law to support this variation, CMI defends its argument by citing § 766A of the *Restatement (Second) of Torts*[2] and W. Haynes, *Kentucky Jurisprudence*, § 12–11 (1987). Haynes does not suggest that Kentucky either has or would adopt such a tort. No Kentucky courts have done so. However, the *Restatement* claims that the tort is now "consistently recognized." *Id.* at § 766A, p. 18.

Kentucky courts have been very cautious in expanding unduly the tort remedies available to those in contractual relationships. There are sound reasons for this caution. The actual language of § 766A is so all encompassing and vague that to adopt it directly would cause tremendous confusion without creating a clear societal benefit. The conduct conceivably within its scope could be indistinguishable from the kind of unfettered commerce upon which courts have been reluctant to pass judgment. Moreover, the available remedies address the most direct

---

**1.** The Restatement (Second) of Torts, § 766, provides:

[c]xcept as stated in Section 698, one who, without a privilege to do so, induces or otherwise causes a third person not to
a) perform a contract with another, or
b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.

**2.** § 766A of the *Restatement, Torts 2d*, provides:

**Intentional Interference with Another's Performance of His Own Contract**
One who intentionally and improperly interferes with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

and readily identifiable harms. The torts discussed in § 766A necessarily involve highly speculative damages. Parties to contracts have a full array of contractual remedies to resolve inequities of performance caused by third persons. The Court is not persuaded that this new tort is necessary to correct a glaring inequity among commercial parties.

Finally, the kind of conduct which is theoretically actionable under this new tort may be of an entirely different quality and character than that found in this case. As examples of actionable conduct Haynes cites destroying building supplies, illegally preventing issuance of building permits, physical intimidation of employees or other kinds of physical interference. Haynes. *Kentucky Jurisprudence*, § 12–11 (1987). Nothing of that character has occurred here.

The Court concludes that in these circumstances Kentucky courts would not adopt the tort of interference with another's performance of his own contract.

## VI.

■ CMI's claim of intentional interference with prospective advantage is conceptually similar to its claim for interference with an existing contract. In *National Coll. Athletic Ass'n v. Hornung*, 754 S.W.2d 855 (Ky. 1988), the Supreme Court of Kentucky set forth the principles governing the tort of Intentional Interference with Prospective Advantage. It held that Sections 766B, 767 and 773 of the *Restatement (Second) of Torts* reflect the prevailing law in Kentucky.[3] To recover under this cause of action, CMI must plead and prove the following elements: (1) the existence of a valid business relationship

or its expectancy; (2) a defendant's knowledge thereof; (3) an intentional act of interference; (4) an improper motive; (5) causation; and (6) special damages.

■ In deciding whether the actor's actions were improper, a court must consider the factors set forth in Section 767 of the *Restatement (Second) of Torts; Hornung*, 754 S.W.2d at 858. Those factors are (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties. Though a defendant's actions may be "improper," he may nevertheless not be liable, if he acted in *good faith* in asserting a legally protected interest. *Hornung*, 757 S.W.2d at 858.[4]

The final element is damages. The question presented is whether the measure of damages in an action for interference with prospective advantage should be different than the measure clearly established in an action for interference with contractual relations. Logically, related causes of action require similar proof for damages. The Court can find no reason to create such a distinction between two torts which arise out of the same conceptual framework.

■ Under Kentucky law, CMI must allege and prove special damages to recover under this cause of action. *Henkin, Inc. v. Berea Bank & Trust Co.*, 566 S.W.2d 420, 425

---

3. Section 766B provides, in part:

**Intentional Interference with Prospective Contractual Relation**
One who intentionally and improperly interferes with another's prospective contractual relations ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
(b) preventing the other from acquiring or continuing the prospective relation.

4. Section 773 · of the *Restatement (Second) of Torts* explains this good faith exception. It states:

**Asserting Bona Fide Claim**
One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

(Ky.Ct.App.1978). Section 766B of the *Restatement (Second) of Torts* states that one who intentionally interferes with the prospective relations of another is liable for the pecuniary damages suffered by the plaintiff. These damages must be proven to a reasonable degree of certainty. *See Musselman Bros. v. Dial–Huff & Assoc.*, 826 S.W.2d 838, 840 (Ky.Ct.App.1992).[5] Ascertaining the damages to any legal degree of certainty can be difficult.

■■■ A review of the case law reveals that the terms 'special' damages and 'pecuniary' damages are used interchangeably. This is consistent with Kentucky's general requirement that an injured party prove "to a reasonable degree of certainty" its damages. Lost profits is an ascertainable measure of damages. *Carmichael–Lynch–Nolan, Etc. v. Bennett, Etc.*, 561 S.W.2d 99, 102 (Ky.Ct.App. 1977). This requirement has the salutary effect of weeding out claims which do not involve seriously damaging conduct.

In this case, the continued viability of CMI's claims rests upon whether there is any evidence that Defendants either caused a third party not to enter into a contractual relationship or that they caused someone to discontinue an existing relationship. CMI has limited its claims to the states of Missouri, Wisconsin and Oregon and the country of Australia. For purposes of analysis, the Court will assume that CMI has established all elements except causation and special damages.

■■■ In the State of Missouri, CMI responded to three separate requests for bids concerning breath alcohol testing equipment. On the first two bids in 1992 and in 1993, the State declared that CMI's bid did not conform to the bid specifications and, therefore, did not award a contract in either case. On the rebid initiated in April 1994, National Patent was the low bidder and received the contract.

No one disputes that on the third rebid National Patent was the low bidder and re-

ceived the contract on that basis and for that reason alone. No facts in evidence suggest any other reason for the state's making its award in April 1994. Because these facts obviously cannot support a claim that Defendants caused CMI to lose the third rebid itself, the Court must determine whether any of Defendants' prior conduct caused the state to reject CMI on the first two occasions, thus denying it the contract before National Patent won it legally on the third try.

Missouri's stated reason for rejecting the first two bids (in which CMI was the only bidder) was that CMI's bid failed to conform to the bid specifications. The Court finds no evidence that the state abused its discretion by making these decisions. CMI makes no such argument. In fact, CMI appears to have made no protest of Missouri's decisions under the state's contracting rules. If the state lawfully rejected CMI's bid, then it cannot be said that Defendants unlawfully caused the state to so act. All the evidence is that to deny the first two bids was within the state's legal prerogative.

CMI's contentions focus upon Cliff Broeder's (of National Patent) successful efforts to lobby numerous Missouri officials to remove Robert Walsh from the bid evaluation committee. Fusco admits that because of his concern that Walsh was biased in favor of CMI, he made every effort to remove Walsh from the evaluation committee. CMI rested its case on the Walsh affidavit. However, that affidavit does not suggest any unlawful conduct by National Patent or Broeder. Of course, Walsh believed himself unbiased. However, the ultimate decision to remove him was neither his nor National Patent's, but rather one for the State of Missouri. Whether the decision to remove Walsh was correct could be argued either way. But there was no evidence that Walsh's removal was improperly procured. Even if it were, there is no evidence that Walsh's removal caused the State to either declare CMI's bid nonconforming on the first two occasions or

---

**5.** The *Restatement* confirms this view: "One to whom another has tortiously caused harm is entitled to compensatory damages for the harm if, but only if, he establishes by proof the extent of the harm and the amount of money represent-

ing adequate compensation with as much certainty as the nature of the tort and the circumstances permit." *Restatement (Second) of Torts*, § 912.

to accept National Patent's low bid in April 1994. Without such proof, Walsh's removal is immaterial to our case.

Finally, during 1992 and 1993 Fusco complained bitterly to Missouri officials that its bid specifications unfairly barred National Patent from placing a bid on the State's breath alcohol analyzer instrument contract. He also suggested that CMI's product would not perform in a satisfactory manner. There is no evidence, however, that these comments caused Missouri to reject CMI's otherwise satisfactory bids. Such claims are pure speculation. Such speculation cannot support the conclusion that Missouri's decisions were legally flawed.

 The facts concerning the States of Oregon and Wisconsin and the country of Australia are relatively more straightforward. In Oregon, CMI continues to perform its contract. The state has neither discontinued the relationship nor failed to enter into other prospective contractual relationships. Consequently, CMI has no claim as to any lost prospective contractual advantages in the State of Oregon.

 As to Australia, CMI premises its case upon the contention that it would have won that contract had its corporate resources not been diverted and weakened by attending to Defendants' malefactions in Oregon and elsewhere. CMI acknowledges that it was unable to bid successfully in Australia because it could not resolve certain engineering and operational concerns raised by the testing officials there. As one consequence of CMI's failure to resolve these difficulties, the Australian authorities concluded in their own evaluation that the Intoxilyzers "as tested are not suitable for evidentiary purposes in Victoria." Presumably, this was one of the reasons why CMI did not receive the bid.

There is no evidence of direct contact between Defendants and Australian officials nor any evidence of Defendants' involvement in or attempted interference with the bid process. Defendants' conduct is simply far too remote to be considered a causing agent. Moreover, there is absolutely no evidence, other than speculation, that CMI would have been awarded the bid had CMI solved the engineering and operational problems. For the same reasons, its proof fails to show that CMI suffered any damages to a reasonable degree of certainty.

 The circumstances in Wisconsin are only slightly more complicated. It is not clear whether the State had bought other CMI equipment prior to the fall of 1993. In any event in late 1993 the State was again considering the purchase of breath alcohol analyzing equipment. As soon as this became known, Forrester made numerous contacts with state officials questioning whether the State might violate Intoximeters' "418" patent and questioning whether the CMI instrument would not work if it utilized an unplated aluminum cell with a dry gas standard. Forrester first contacted George Menart in September 1993, for this very purpose. According to Menart, Forrester was concerned that Wisconsin might be violating Intoximeters' patent with the use of Mathison gas on one of its units, 1400 Series. Menart stated that Forrester claimed that using a dry gas standard with the Intoxilyzer 5000 without paying some type of royalty would or could lead to possible patent problems.

Forrester spoke to Thomas Geske (Wisconsin) in early fall about CMI's units which may involve the use of a dry gas standard and, therefore, might violate Intoximeters' patent. On September 17, 1993, Forrester wrote a letter to a Mr. Sobitik, Assistant Attorney General for the Wisconsin Department of Transportation.

The letter questions whether the litigation in this Court will resolve the issues presented in Wisconsin and states

> the answer to that question [whether there is an infringement or not] may vary based on the model or date of manufacture. Again, that is why we sought clarification of the type of equipment Wisconsin intended to use with the dry gas standard.

Forrester enclosed a copy of the "418" patent. Thereafter, Wisconsin requested and CMI provided an agreement to indemnify and hold harmless the State for all claims arising out of the alleged patent infringement.

In summary, there is absolutely no evidence from any source that the State of Wisconsin failed to enter into any intended contract or business relationship with CMI or that it discontinued an existing relationship with CMI. The evidence is exactly the contrary. Thus, regardless of whether Forrester's conduct meets any of the other elements required for intentional interference with prospective advantage, the evidence completely fails to show that the actions caused any response from the State of Wisconsin, other than to request indemnification. Consequently, CMI has no evidence of damage within a reasonable degree of certainty.

For all those reasons, CMI's various claims for interference with prospective contractual relations do not meet the essential elements and must be dismissed.

### VII.

■ As the Kentucky Court of Appeals aptly noted, the tort of defamation is "not a readily understood area of the law." *Columbia Sussex Corp., v. Hay*, 627 S.W.2d 270, 272 (Ky.Ct.App.1981). Generally, defamation consists of the following elements: (1) defamatory language; (2) about the plaintiff; (3) which is published; (4) which caused injury to reputation. *Id.* The defamatory statement must be false. *Pennington v. Little*, 99 S.W.2d 776 (Ky.1936).

In theory, one may argue defamation under the tort of slander or the tort of libel. The two vary only as to the third element: the medium through which the alleged defamatory statements were made. Kentucky further delineates libel and slander actions into two subclasses: those that are *actionable per se* and those that are *actionable per quod*. *Digest Publishing Co. v. Perry Publishing Co.*, 284 S.W.2d 832, 834 (Ky.1955).

■ In a *per quod* action, the words themselves may or may not be defamatory. Courts focus not upon the actual meaning of the words but on the extrinsic facts which explain the meaning of the communications. *Columbia Sussex*, 627 S.W.2d at 372. *See also Elkins v. Roberts*, 242 S.W.2d 994 (Ky. 1951). More important for the Court's analysis here is that historically, damages to

corporate reputation may be proven only by loss of profits caused by the defamation. The pecuniary loss must be a direct and proximate result of the defamation. *Sweeney*, 60 S.W.2d at 383. Because CMI does not have evidence of a reasonably certain direct or proximate relationship between any communication of Defendants and lost profits by CMI, it cannot prove the essential elements of defamation *per quod.*

■ In an action for defamation *per se*, however, CMI need not plead or prove special damages. Rather, damages are presumed. Consequently, whether any of Defendants' communications constitute defamation *per se* is central to this case. However, a higher standard defines a *per se* action. To constitute defamation *per se*, the words in their essence

> must tend to expose the plaintiff to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people and to deprive him of their friendship, intercourse and society. But it is not necessary that the words imply a crime or impute a violation of laws, or involve moral turpitude or immoral conduct.

*Id.*

■ The Court must consider "if [the words] directly tend to the prejudice or injury of a person in his profession, trade or business." *White v. Hanks*, 255 S.W.2d 602 (Ky.1953) (*slander per se*); *Tucker v. Kilgore*, 388 S.W.2d 112 (Ky.1964) (*libel per se*); *Sweeney & Co. v. Brown*, 60 S.W.2d 381, 384 (Ky.1933) ("to be *libelous per se*, [the words] must be of such nature that the court can presume as a matter of law that they tend to disgrace and degrade a person, or injure him in his business or profession, or to hold him up to public hatred or ridicule and cause him to be shunned and avoided."); *See also Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270 (Ky.Ct.App.1981); *White v. Hanks*, 255 S.W.2d at 603. (Words are *slanderous per se*, if they either directly or indirectly import "fraud, dishonesty, or sharp or unethical practices on the part of the [plaintiff].")

In determining whether a writing is *libelous per se*, courts must stay within the "four corners" of the written communication. The words must be given their ordinary, natural meaning as defined by an average lay person. The face of the writing must be stripped of all innuendos and explanations. *Sweeney*, 60 S.W.2d at 394; *Digest Publishing*, 284 S.W.2d at 834. In a *slander per se* action, if the words imply a crime or impute a violation of the law, the requisite elements are met. *Columbia Sussex*, 627 S.W.2d at 274.

These concepts are certainly important. However, it is more important that they be understood and analyzed within the context of this case, which is that the defamation alleged concerns a corporation and one of its products. The Court has carefully considered the circumstances in a business setting which might constitute defamation *per se*. The doctrine of defamation *per se* grew out of a need to provide individuals a remedy for statements which damaged their reputations by the very nature of the words where the individuals could not prove actual damages. The concept makes a great deal of sense in a personal context.

So far as the Court can tell, considerably less thought has been devoted to applying these concepts to the entirely different setting of business relationships and corporate competition. Businesses do not have personalities that are hurt so intangibly. If a business is damaged, the damage is usually reflected in the loss of revenues or profits. Therefore, courts should be very cautious about labeling as defamation *per se* comments made about a corporation or its products.

Few cases have addressed the issue of whether criticism or disparaging words about a company's products are *actionable per se*. It has been said that the "words [must] contain an imputation of fraud, deceit, dishonesty or other reprehensible conduct on the part of the merchant." *White v. Hanks*, 255 S.W.2d at 603. Sometime ago Judge Ballantine appeared to assume that unless "the words contain an imputation of fraud, deceit, dishonesty or other reprehensible conduct" they are not *actionable per se*.

*Mario's Enterprises, Inc. v. Morton–Norwich Products*, 487 F.Supp. 1308, 1310 (W.D.Ky.1980). To merely say bad things about a product or to say, in so many words, that it will fail in its essential purpose, would seem not to constitute defamation *per se*. 255 S.W.2d at 603.

It is not easy to conclude that CMI is exposed to "public hatred, ridicule, contempt or disgrace" by statements that it infringed upon a patent or that one of its products cannot possibly work. Without more, the charge that a product does not work is not intrinsically defamatory. For if there are reasons given for the opinion, as here, it has the appearance of normal competition in the marketplace.

Similarly, depending on how a statement is made, a charge of patent infringement would not hold a company to hatred, ridicule or disgrace. Among business people, patents are known to be complicated and in infringement issues even more so. The statement by one party that another is infringing does not carry an intrinsic moral or business turpitude. For instance, it is not the same as calling one a liar, bankrupt or untrustworthy. However, the words need not impute moral turpitude or immoral conduct to a corporation in order to be defamation *per se*. The Court cannot say that simply stating that a corporation violates a legal patent will constitute defamation *per se*. Therefore, the Court has no alternative other than to review each separate statement or writing alleged to determine whether it could meet the standard of defamation *per se*.

The July 29, 1992, letter does not charge CMI with patent infringement. It makes a suggestion that Oregon's specifications will result in an infringement. It exaggerates the scope of the patent, but not in the context of a statement against CMI. The fact that it caused the State of Oregon to request indemnification for patent infringement does not impute defamation.

The comments at the T–92 conference may show malice, but may not constitute defamation. CMI declaimed knowledge of other evidence of specific comments to third parties at that conference.

■ Forrester's comments to Missouri officials at the October 16, 1992, pre-bid conference are not specific enough to be classified as defamation *per se*. They "concerned" the on-going patent dispute. None of the statements, and there are only very few, attributed to Forrester or Fusco in Missouri rise to the level of defamation *per se*.

■ The October 5, 1992, letter incorrectly suggests that the Oregon bid specifications would require a successful bidder to infringe on the "418" patent. However, it makes no comment against CMI. National Patent's letters of October 6, 1992, are formal letters of inquiry and protest. The November 11, 1992, letter containing Polster's letter states an incorrect interpretation of the patent scope. It incorrectly asserts the opinion that an untreated surface will produce inaccurate results. Polster's letter is in the nature of a patent opinion and is somewhat qualified. Forrester's December 7, 1992, letter implies that CMI is lying about the chamber material and that CMI is unlawfully evading the patent. He states an exaggerated scope of the patent. None of these letters constitute defamation *per se*.

The March 1993, Louisville conference is the alleged source of numerous defamatory statements. However, a thorough review and discussion at the conference reveals no specific statements to third parties. CMI also relies upon fourteen (14) of Forrester's statements as referenced on pages 10 and 11 of its CMI's Memorandum (Docket No. 237). As becomes clear from the Court's earlier review, none of these comments as reported intrinsically convey the reprehensible conviction of defamation *per se*. Quite simply, these statements are neither specific enough nor critical enough to be defamation *per se*.

■ Polster's March 1, 1993, letter exaggerates the patent. It also accuses Oregon of being a party to a deception that CMI is the initiator of the deception. The statements are so conditioned and, quite frankly, so confusing that it would be difficult to call any of them defamatory at all. Fusco's March 29, 1993, letter repeats speculation and asks Oregon to provide information. It is carefully worded and is not defamatory.

■ Forrester's April 13, 1993, letter to Oregon officials implies a deception by CMI as to the true composition of its chamber. It goes without saying that Oregon had actual knowledge of the alloy composition and, therefore, could not be deceived. On the other hand, Forrester still had not conducted an on-site inspection of the Intoxilyzer 5000. He qualifies the criticism of untreated aluminum cells by giving an opinion based on "Intoximeters experience." Among other things, in view of its qualifications, this letter cannot qualify as defamation *per se*.

■ Forrester's various communications to Wisconsin officials exaggerate the "418" patent. But they may fall short of even accusing CMI of patent infringement. The September 17 letter, for instance, contains no defamatory statements. It seeks clarification from the State. The allegations of verbal communication are somewhat general but intend to track the written correspondence. Clearly, none of the communications are defamatory *per se*.

The Court can find no statements to Australian officials which constitute defamation *per se*.

## VIII.

■ To constitute a claim of misrepresentation or actionable fraud under Kentucky law, CMI must plead and prove the following elements: material misrepresentation, falsity, scienter or recklessness, intention, reliance, deception and injury. *Scott v. Farmers State Bank*, 410 S.W.2d 717, 720 (Ky.1966). In other words,

> [I]t must appear: (1) that defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon *by plaintiff*; (5) that *plaintiff acted in reliance* upon it; and (6) that he thereby suffered injury.

*Miles v. Proffitt*, 266 S.W.2d 333, 335 (Ky. 1954) (emphasis added), *overruled in part*, *Sebastian v. Floyd*, 585 S.W.2d 381 (Ky. 1979).

■] CMI alleges that Defendants or their agents "intentionally misrepresented to prospective customers and users of the CMI products that said products were flawed and ineffective" (Pl.'s Compl. ¶ 50); that Defendants "knew or should have known ... that such representations would be acted upon by the customers and users of CMI products" (¶ 51); and "as a direct and proximate result of said intentional misrepresentations, CMI has been severely damaged ..." (¶ 52).

The essence of any misrepresentation claim mandates that the defendant *misrepresented a material fact to the plaintiff,* that the *plaintiff relied thereon,* and that the *plaintiff's reliance caused the consequential damages.* CMI does not allege that the Defendants misrepresented any material fact to it. Nor does CMI claim it relied upon any alleged misrepresentation. Finally, CMI cannot prove that its reliance caused the alleged damages. Citing no case law in support of its argument, CMI urges this Court to expand the scope of an actionable fraud claim by permitting it to assert a claim based upon third party rights. CMI wants to " 'stand in the place' of those customers with reference to the issues of intentional misrepresentation and reliance upon the same." (Pl.'s Reply p. 55). While novel in its genesis, Kentucky courts have not recognized such an argument. CMI cites no persuasive authority to suggest that it should.

Therefore, this Court has no basis upon which to predict that Kentucky would expand its law as to misrepresentation. CMI's claims must be dismissed.

### IX.

■ A dearth of case law in Kentucky exists governing the tort of injurious falsehood. No Kentucky court has formally recognized it. Consequently, CMI focuses upon *General Electric Co., v. Sargent & Lundy,* 916 F.2d 1119 (6th Cir.1990); an opinion in which the Sixth Circuit defined the tort of injurious falsehood. Untangling the origins and subtle nuances of this tort is not easy.

However, it is an important and illuminating task for it convinces the Court that Kentucky courts would not create such a new cause of action.

In *General Electric v. Sargent & Lundy,* the issue as to whether Kentucky would recognize the tort of injurious falsehood was not before the court. However, the district court had adopted the tort and the Sixth Circuit merely restated the basis for that ruling. The lower court based its decision in large part on the fact that Kentucky recognized related torts, Kentucky traditionally relied upon the *Restatement* as authority, and a Kentucky Court of Appeals' quotation of Prosser acknowledged the existence of this tort. The Sixth Circuit defined 'injurious falsehood' as follows:

Injurious falsehood consists of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general ... of a kind calculated to prevent others from dealing with him or otherwise to interfere with his relations with others to his disadvantage.

*Id.* at 1124 (citing W. Keeton, *Prosser and Keeton on the Law of Torts* § 128, at 967 (5th ed. 1984)).

The *Restatement (Second) of Torts* § 623A sets forth a general definition of the tort. It provides:

§ 623A. Liability for Publication of Injurious Falsehood—General Principle

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

The *Restatement* further delineates injurious falsehood into the tort of slander of title [6] and

6. § 624 of the *Restatement (Second) of Torts* provides:

Disparagement of Property—Slander of Title

The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of a false statement disparaging another's property rights in land, chattels or

the tort of trade libel.[7] Although by no means an exhaustive list of specific applications of § 623A's general principles, these are two of the more common bases for arguing harms to interests having a pecuniary value.

Prosser notes that injurious falsehood developed out of the "slander of title" tort. The grounds traditionally involved the defendant's allegedly calling into question plaintiff's title to property. The tort later evolved to include written aspersions, questioning one's title to non-realty, and disparaging the quality of property, a product or the business itself. W. Keeton, *Prosser and Keeton on the Law of Torts* § 128, p. 963 (5th Ed.1984). Prosser notes, for example, that if the publisher of the comment claims that plaintiff is infringing defendant's patent, this certainly does not disparage the quality of the plaintiff's product. In this instance, the crux of plaintiff's claim, Prosser maintains, is interference with an economic advantage.[8]

The *Restatement* is quite clear that the tort provides a remedy for an attack on the quality of the good itself. However, if the plaintiff also claims that its reputation is damaged by defendant's claiming that plaintiff sold instruments which do not work, then the plaintiff's recourse is a claim of defamation. *See* § 626, Comment d, *Restatement (Second) of Torts.*

The tort's final metamorphosis resulted in the denomination of 'injurious falsehood.' This final change may have so loosened the tort's historic roots that it is now confused with pre-existing torts for which it is not an alternative. The scope of the tort, for instance, was not intended to include harm to personal reputation (a defamation action) nor was it designed to remedy harm caused by interference with contracts or prospective economic advantage. An unfortunate additional consequence of using the generic term 'injurious falsehood' is that the once separate torts of 'slander of title' and 'trade libel' are now meshed. Consequently, courts are left with the dilemma of determining whether a state who recognizes the former would now, in fact, recognize the latter.

Kentucky courts do recognize the tort of slander of title. *Bonnie Brai Farms, Inc. v. Robinson,* 598 S.W.2d 765 (Ky.Ct.App.1980). On the other hand, they have not specifically used the term 'trade libel' or the generic term 'injurious falsehood' to describe an injury resulting to one's products or reputation in general. Rather, the courts have generally classified such claims as defamation. *See White v. Hanks,* 255 S.W.2d 602, 603 (Ky. 1953) (In an action for slander, the Court said that "the accepted rule [is] that disparaging words spoken with reference to goods sold by a merchant are not actionable *per se* unless the words contain an imputation of fraud, deceit, dishonesty or other reprehensible conduct on the part of the merchant"); *KFC v. Sanders,* 563 S.W.2d 8 (Ky.1978) [In a defamation cause of action,] plaintiff claimed Colonel Sanders defamed its restaurant and its products (mashed potatoes and fried chicken). The Supreme Court affirmed the dismissal of the case because plaintiff failed to prove it was the target of the Colonel's comments. However, of significance is the Supreme Court's classifying the dispar-

---

intangible things, that the publisher could recognize as likely to result in pecuniary harm to the other through the conduct of third persons in respect to the other's interests in the property.

**7.** § 626 of the *Restatement (Second) of Torts* provides:

Disparagement of Quality—Trade Libel
The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of matter disparaging the quality of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property.

**8.** In describing injurious falsehood, Prosser stated that

[T]oo much emphasis has been placed upon the property element. The gist of the tort is the interference with the prospect of sale or some other advantageous relation; and it is equally possible to disparage the plaintiff's business... A common illustration is the assertion that the sale of the plaintiff's product infringes the defendant's patent ... which is scarcely can be said to disparage the title or quality of the goods themselves. The disparagement may be by implication. W. Keeton, *Prosser and Keeton on the Law of Torts,* § ——, p. 966 (5th Ed.1984).

aging comments of the products as a (defamation cause of action.). *See also Mario's Enterprises, Inc. v. Morton–Norwich Products*, 487 F.Supp. 1308 (W.D.Ky.1980).

Those grappling with the tort's scope and application are not found exclusively in the jurisdiction of Kentucky. The Federal Court of Appeals for the District of Columbia wrestled with distinction between defamation and injurious falsehood. In refusing to recognize the torts as separate causes of actions, it stated:

> Although distinctions exist at common law between actions for injurious falsehood and defamation, the torts have always been very closely related. (Citations and footnote omitted). Moreover, changes in the law of defamation produced by first amendment decisions have further minimized the common law distinctions between the torts. (Citations omitted). The primary difference between injurious falsehood and defamation is the requirement in an injurious falsehood action of pecuniary harm. (Citations omitted). Even this distinction is negligible, however; a corporation suing for defamation, for example may only recover actual damages in the form of lost profits (Citation omitted). Art Metal's argument, therefore, is based on an illusory distinction between its interest in its reputation (which would be vindicated by a defamation action showing lost profits) and its pecuniary interest in its products (which would be vindicated by an injurious falsehood action requiring pecuniary harm).

*Arts Metal—U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155–56 (D.C.Cir.1985). Adding more confusion to the matter is the following observation made by Prosser:

> [Injurious falsehood] is a useful [term] by which to distinguish personal defamation claims. Since in every case of injurious falsehood the plaintiff must prove special damage, such as the loss of a present or prospective advantage, it seems clear that the injurious falsehood claim should be

regarded merely as one form of intentional interference with economic relations rather than as a branch of the more general harm to reputation involved in libel and slander. . . .

Prosser, *Law of Torts*, 5th Edition, at page 964; *see also Sargent & Lundy*, at 1124.

The parties cite *Gray v. Central Bank & Trust Co.*, 562 S.W.2d 656 (Ky.Ct.App.1978) as persuasive authority on the issue of whether Kentucky would recognize the general tort of injurious falsehood. In *Gray* the Court of Appeals addressed whether the torts of defamation and intentional interference with prospective contractual relationships were separate causes of actions. In concluding in the affirmative, the court quoted Prosser.[9] However, its analysis did not end at that point. If the *Gray* Court were to recognize the two torts as separate causes of actions, it had to consider whether the law of privileges applied to the new tort. The court concluded in the affirmative.

The Court finds that it requires a leap of faith unsupported by logic, policy or Prosser to say that *Gray* suggests support for a new tort of injurious falsehood. First, the Court of Appeals cited Prosser merely for the proposition that defamation and intentional interference with contractual relations were separate torts. Prosser noted only that "the greatest protection is given to personal reputation, and existing contracts, the least to competitive interest in future advantage." Omitted is any reference to the tort of injurious falsehood; the *Gray* Court was equally silent on the matter.

Second, the *Gray* Court may have rightly assumed that the tort of injurious falsehood does not give rise to a separate cause of action. Instead, Kentucky's current tort law provides the appropriate remedy for which the tort of injurious falsehood was traditionally designed to give. Third, the Prosser quote applies only to the extent that it de-

---

9. Prosser, in his treatise, *Law of Torts*, 4th Edition, Chapter 25, Section 130, at page 926 states:
 Defamation, interference with contract, injurious falsehood, and the broader tort of interference with prospective economic relations, are all different phases of the same general wrong of depriving plaintiff of beneficial relations with others·... the greatest protection is given to personal reputation, and existing contracts, the least to competitive interest in future advantage.
 562 S.W.2d at 658.

fines the scope of the respective privilege. Absolute privileges applied to all *recognized* torts. Kentucky courts have not recognized this new tort and it is entirely unclear that Prosser counsels the state to do so.[10]

The Court concludes that there is insufficient authority upon which it could predict that Kentucky courts would establish an entirely new cause of action for injurious falsehood. Kentucky courts have consistently considered similar circumstances under the rubric of defamation. Indeed, the same set of facts which CMI argues is an injurious falsehood also could give rise to claims of defamation, slander of title, intentional interference with prospective advantage and contractual relations. No one has satisfactorily explained the unfairness addressed by the tort of injurious falsehood, which is not already covered by existing law. No one has explained the necessity of the new tort nor set out important interests of justice which the cause would secure.

Although Kentucky's courts have had many opportunities to articulate a new tort such as injurious falsehood, they have failed to do so.[11] The Court finds no compelling policy reasons for the new tort. It provides limited additional protection for corporations and their products. While Kentucky courts traditionally have expanded legal vistas to protect consumers, the courts' interest seems less focused upon additional legal rights for corporations. Perhaps there are good policy reasons for this cautious attitude. In any event, the Court finds no compelling reason to take a step which Kentucky state courts have thus far declined to make.

## X.

▪ In order to state a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege the following elements: (1) conduct (2) of an enterprise (3) through a pattern of racketeering activity. *Sedima, S.P.R.L. v. Imrez, Co.*, 473 U.S. 479, 496 (1985). Section 1961(1)(B) of Title 18 sets forth conduct that could be classified as a racketeering activity or predicate acts. CMI relies upon the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 respectively, in pursuing its civil RICO claim. A plaintiff alleging a civil RICO action based upon fraud must "state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact." *Blount Financial Services, Inc., v. Walter E. Heller & Company*, 819 F.2d 151, 152 (6th Cir.1987). *Cf.* Fed.R.Civ.P. 9(b).

▪ A criminal conviction of the defendant for mail or wire fraud is not a condition of a plaintiff's arguing these as the basis for its civil RICO suit. "[H]owever, the conduct used to support a civil RICO action must be *indictable*. (Citation omitted)." *Central Distributors of Beer, Inc., v. Conn*, 5 F.3d 181, 183 (6th Cir.1993) (emphasis in the original). Consequently, the plaintiff must prove each of the requisite elements of the respective offenses to maintain its civil RICO action. *Id.*

▪ The following elements must be alleged and ultimately proven to recover for mail fraud: "(1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud. Similarly, a wire fraud violations

---

10. At page 924, Prosser further states:
In general, it may be said that injurious falsehood which is a tort that never has been greatly favored by the law, is *subject to all of the privileges* recognized both in cases of personal defamation and in those of other types of *interference with economic advantage*. The question of *absolute privilege* to disparage in judicial, legislative, and executive proceedings has seldom arisen, except in connection with pleadings, motions, and the like in the course of litigation, *where it has been recognized.*

11. Simply because the tort finds a place in the pages of the *Restatement (Second) of Torts* and, thus, receives a mention in Haynes, *Kentucky Jurisprudence*, does not mean that Kentucky would approve it. Kentucky's common law has on occasion developed quite competently without aid of the *Restatement*. For example, Kentucky courts have apparently never found the need to adopt *Restatement (Second) of Torts*, § 558, regarding defamation.

[sic] consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." *Id.* [Quoting *Schreiber Distributing Co., v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1399–1400 (9th Cir.1986) ].

Civil RICO was designed to remedy, *inter alia,* harm caused *to the plaintiff* as a result of plaintiff's *reliance upon* a defendant's alleged fraudulent use of the wire or mail. The Sixth Circuit stated:

> [Plaintiff] cannot maintain a civil RICO claim against these defendants absent evidence that the defendants made misrepresentations or omission of material fact to [plaintiff] and evidence that [plaintiff] relied on those misrepresentations or omissions to its detriment. (Citations omitted).

*Central Distributors,* 5 F.3d at 184. The court went on to say:

> In our opinion, the fraud connected with mail or wire fraud must involve misrepresentation of omissions flowing from the defendant to the plaintiff. Although a general fraudulent scheme which incidentally affects a person may support other civil claims against the wrongdoer, the victim *cannot assert a RICO claim absent evidence that the defendant made representations to the victim.* [Plaintiff] has not produced a shred of evidence showing that any of the defendants made any false statements or omissions to [plaintiff] or that *[plaintiff] relied on any statement or omission to its detriment....* Although the defendants may have committed other wrongs by this scheme, nothing in the record supports [plaintiff's] claim that the defendants violated RICO in any way.

*Id.* (Emphasis added).

 It appears that CMI has missed the crux of the Defendants' argument: CMI failed to allege and prove that it relied upon any alleged fraudulent statements made by Defendants. The gravamen of this Court's decision, like its reasoning for dismissing the misrepresentation cause of action, is the utter lack of allegations or proof that the statements upon which CMI bases its claim were made to it, and/or its reliance upon said misrepresentations. Under these circumstances, the RICO claim cannot stand.

### XI.

 The Court now turns to the issue of patent misuse. Defendants move for summary judgment on this issue arguing that patent misuse is not an affirmative cause of action. After again reviewing the existing case law, the Court must agree. Patent misuse cannot be the basis of a cause of action. Rather, it is an *affirmative defense* to a patent holder's claim of infringement.

In *Transitron Electronic Corp. v. Hughes Aircraft Co.,* 487 F.Supp. 885 (D.C.Mass. 1980), the District Court addressed what it described as a case of first impression: Can patent misuse be a basis for a cause of action? In ruling negatively, it discussed the history of this equitable defense and the purposes behind its genesis. The Court agrees with the analysis offered by the *Transitron* Court. It stated:

> Patent misuse was developed as an equitable doctrine to provide an equitable defense, analogous to the clean hands defense, against an infringement action. (Citation omitted). A patentee may commit patent misuse in improper exploitation of the patent either by violating the antitrust laws or extending the patent beyond its lawful scope. That the doctrine does not create an independent cause of action for the alleged infringer is implicit in the black letter statement of the effect of finding patent misuse: "Misuse of a patent merely suspends the owner's right to recover for infringement of a patent." The courts have uniformly held that the owner's rights to recover for infringement is reinstated once the offensive practice has been abandoned and its effects have been purged.

*Id.* at F.Supp. at 893. The fact that alternative causes of actions existed further persuaded the court that patent misuse could not give rise to an independent cause of action. The same logic and circumstances, now persuade this Court to reach the same conclusion. In essence, CMI has achieved, in great measure, the equitable relief it needed:

(1) this Court's determination that the Intoxilyzer 5000 did not infringe on the "418" patent and (2) this Court's conclusion that Intoximeters had no basis for stating that the extruded aluminum cell did not cause unreliable results.

### XII.

■ Pursuant to 35 U.S.C. § 285, CMI has requested attorneys' fees. The Code gives a court the discretion to award attorneys' fees to the prevailing party of a patent infringement case in exceptional cases. The Sixth Circuit has interpreted 'exceptional cases' to mean those circumstances "incorporating concepts of fraud, malice, bad faith and other similar concepts. (Citations omitted)." *Deyerle v. Wright Manuf. Co.*, 496 F.2d 45, 54 (6th Cir.1974). In reaching its decision, a court must make specific findings of "conduct that is unfair, in bad faith, inequitable or unconscionable. (Citation omitted)." *Id.* The burden is upon the party requesting the fees to prove by clear and convincing evidence that it merits the exceptional case status. *Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1364 (Fed.Cir.1990).

■ However, one caveat exists. A prevailing party may recover only the attorneys' fees reasonably related to the prosecution of its patent claims. *Deyerle*, 496 F.2d at 54. (If an action contains both patent and non-patent claims, the party may not recover attorneys' fees for the non-patent related claims); *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288 (9th Cir.1969).

■ The resolution of various common law claims by this Court or a jury has no bearing upon the decision to classify this case as exceptional. In the common law claims, the Court examines Defendants' actions as they impact Plaintiff. In determining an exceptional case, the Court focuses upon conduct "unfair, inequitable or unconscionable" as to the patent, which also affected Plaintiff.

The different focus of this inquiry requires the Court to consider Intoximeters' knowledge of the patent and its origins as well as its claims. The Court continues to believe that the conduct found here may well constitute an exceptional case under 35 U.S.C. § 285.

By separate order the Court will set a schedule for further and final briefing of this issue.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The Court having reviewed the excellent memoranda of counsel and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that the motion for summary judgment of National Patent is SUSTAINED and all claims against National Patent are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the motion for summary judgment of Intoximeters is SUSTAINED and all claims against it are DISMISSED WITH PREJUDICE except the remaining claim for attorneys' fees pursuant to 35 U.S.C. § 285.