### D. Claims under the Texas Securities Act, Article 581–33

Because there are no heightened pleading requirements and because the Texas Act does not require proof of reliance, scienter, or a duty to disclose on the part of the offeror or sellers, the Court finds that Lead Plaintiff has stated a claim under the Texas Securities Act against J.P. Morgan, Lehman, and Arthur Andersen.

Accordingly, for the reasons indicated above, the Court

ORDERS the following:

(1) CIBC's motion to dismiss(# 615) is DENIED;

(2) Citigroup's motion to dismiss (# 629) is DENIED;

(3) J.P. Morgan Chase & Co.'s motion to dismiss (# 632) is DENIED;

(4) Barclays' motion to dismiss (# 653) is DENIED;

(5) Credit Suisse First Boston's motion to dismiss (# 658) is DENIED;

(6) Bank of America Corporation's motion to dismiss (# 664) is GRANTED as to claims under § 10(b) and Rule 10b–5, but DENIED as to Lead Plaintiff's claim under § 11 for the 7.35% Notes due on 5/15/09, pursuant to the Registration Statement of 5/19/99;

(7) Provided that Lead Plaintiff supplements its complaint as indicated *supra*, Merrill Lynch & Co.'s motion to dismiss (# 667) is DENIED;

(8) Lehman Brothers Holdings Inc.'s motion to dismiss (# 679) is GRANTED as to Lead Plaintiff's claims under § 10(b) and Rule 10b–5, but DENIED as to claims under § 11 and the Texas Securities Act;

(9) Deutsche Bank AG's motion to dismiss (# 716) is GRANTED;

(10) Kirkland & Ellis's motion to dismiss (# 660) is GRANTED;

(11) Vinson & Elkins L.L.P.'s motion to dismiss (# 648) is DENIED; and

(12) Arthur Andersen LLP's motion to dismiss (# 650) is DENIED; and

(13) Lead Plaintiff's § 10(b) claims relating to the 7% Exchangeable Notes and 8.375% Notes are DISMISSED.

**FIELDTURF, INC. and Fieldturf International, Inc.,**
**Plaintiffs,**

v.

**SOUTHWEST RECREATIONAL INDUSTRIES, INC.,**
**Defendant.**

**No. CIV.A. 00–12–JMH.**

United States District Court,
E.D. Kentucky,
Lexington.

Nov. 21, 2002.

Susan J. Mohler, Frost Brown Todd LLC, Lexington, KY, Arthur S. Beeman, W. Bruce Baird, Frost Brown Todd LLC, Louisville, KY, Susan L. Williams, Frost Brown Todd LLC, New Albany, IN, for Plaintiffs.

P. Douglas Barr, William L. Montague, Jr., Richard B. Warne, Joanne Richards, Stoll, Keenon & Park, LLP, Lexington, KY, Michael A. Piazza, Richard Levin, Amy K. Bock, Lisa S. Gallerano, Scott T. Williams, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Dallas, TX, Raymond E. White, Chris P. Perque, Richard A. Fordyce, Gregory C. Mathis, Adam D. Sheehan, Akin, Gump, Strauss, Hauer & Feld, Austin, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

This action is before the Court on Defendant's motions. First, the Court will consider the defendant's Renewed Motion for Partial Summary Judgment Regarding Claims Accruing Before May 20, 1999 [Record No. 342]. Plaintiffs have responded [Record No. 363], to which Defendant has replied [Record No. 365]. The Court will also consider Defendant's Motion for Summary Judgment [Record No. 350]. Plaintiffs have responded [Record No. 363] and Defendant has replied [Record No. 365]. These matters are now ripe for decision.

## FACTUAL BACKGROUND

Plaintiffs FieldTurf, Inc. and FieldTurf International, Inc. ("FieldTurf") and Defendant Southwest Recreational Industries, Inc. ("Southwest") are competitors in the artificial turf market. The artificial, carpet-like surfaces made by these parties and other competitors have shown themselves to be useful alternatives to natural grass surfaces and include both "conventional" (knitted nylon surfaces) and "filled" turf systems (tufted polyolefin surfaces with granular top-dressing). These systems are used in a variety of settings in the sporting world, including golf, soccer, football, and baseball facilities.

Plaintiffs manufacture a product called FieldTurf®.[1] Defendant Southwest Recreational Industries, Inc. ("Southwest") manufactures, sells, and installs several artificial turf systems, including AstroPlay®.[2] Both of these products are filled turf systems.

### 1. United States Patent No. 4,337,283

In the early 1970s, a professional golfer-turned-inventor, Frederick T. Haas, developed a product he called "Mod–Sod," a "filled" turf system using an infill of sand and cork and a pile fabric available in the market at that time. This combination of goods was later patented as U.S. Patent No. 4,337,283 (the " '283 Patent").

The patent application for the invention that would eventually be embodied in the '283 Patent was filed on September 11, 1980, by Haas, for a "synthetic turf playing surface with [a] resilient top-dressing."[3]

1. Plaintiffs allege that their product, FieldTurf®, embodies the claims of U.S. Patent No. 4,337,283 and is, in keeping therewith, a playing surface for athletic games, comprising a firm, stable subsurface, blades of synthetic grass tufted to a uniform height, and having a specially-mixed infill composed of resilient material and specially graded silica sand. The history of this patent and its subsequent assignment and licensing is recited hereinbelow.

2. Southwest entered the sports surfacing business as a manufacturer and installer of running tracks in 1984, later expanding into the artificial turf business by first acquiring the rights and assets in the United States for a well-known conventional turf system, AstroTurf®, from Balsam AG and its American subsidiary in a bankruptcy sale. In 1994, Southwest began developing a "filled" turf product, later marketed as AstroPlay®; placing a layer of granulated rubber against a carpet backing and trapping it there, so that it could not be displaced by the sand also contained in the product over time, preventing the sand from compacting. Curled nylon fibers were sewn into the carpet backing, and the nylon "root zone" fibers held the rubber particles in place. Defendant subsequently modified the specifications of some AstroPlay® systems such that they contained no sand, only granulated rubber. The AstroPlay® "filled" systems are marketed with the option of an underlying shock-absorbing pad.

3. Claim 1 of the '283 Patent defines the patented invention as a "playing surface for athletic games comprising: (a) a firm, stable subsurface; (b) a pile fabric having a flexible backing and normally upstanding pile elements resembling grass; the length of said pile elements being substantially uniform and lying in the range from 1/2 to 2 inches; and (c) a compacted top-dressing layer comprising a mixture of from 25 to 95 volume percent

On December 29, 1980, Haas assigned the patent to "Mod–Sod Sports Surfaces, a partnership consisting of Frederick T. Haas, Jr., Rebecca Ann Bain[,] Haas Cloudman, Frederck T. Haas, III, and Michael Howard Haas" ("Mod–Sod"). The assignment was recorded at the U.S. Patent and Trademark Office ("USPTO") on January 2, 1981. From December 29, 1980, until the expiration of the '283 Patent on September 11, 2000, there were no further conveyances recorded in the USPTO to any person or entity of any rights in the '283 Patent. Specifically, there are no records of any rights conveyed back to Haas as an individual or to the corporation called Mod–Sod Sports Surfaces, Inc. ("Mod–Sod Corp."), formed on April 4, 1982.

However, Haas has stated in deposition testimony in an action in the Covington Division of this District (discussed below) that he assigned the title and rights to the '283 patent to Mod–Sod Corp. Plaintiffs refer to an exhibit to that deposition entitled "Patents Issued to MSSS, Inc." and listing the '283 Patent along with Haas's testimony to demonstrate a binding and legal conveyance rights to that patent. Haas, reviewing the document contained in that exhibit, stated:

> These [the patents] were issued, I think first to me and I assigned them at a later date to Mud–Sod [*sic*] Sports Surfaces, Inc.

[Haas Covington Depo. at 13:12–14:6.] In response to a question about whether the "form of business had gone from [himself] individually to the Mud–Sod [*sic*] Sports Surfaces partnership all of the way to Mod–Sod Sports Surfaces the corporation...," Haas replied, "Yes." [*Id.*]

The preamble to the 1994 "Exclusive License Agreement" signed by SynTenni-Co, Prevost, Mod–Sod, Inc., and Haas, as a representative of Mod–Sod Corp., provided that the:

> Licensor has the sole right to grant for the United States its territories and possessions and for the entire World (collectively, the "Territory"), licenses under the Inventions, of the scope hereinafter granted...

[Exclusive License Agreement at Preamble.] Further, the agreement provided that "[l]icensor hereby grants to Licensee the exclusive and irrevocable (except as otherwise reserved and provided for herein) right and license to make, have made, use sell and otherwise commercialize and exploit, through the Territory, products embodying the inventions..." [*Id.* at ¶ 1.]

However, there exists a subsequent "letter agreement", dated June 19, 1998 and apparently still in force, stating that it "cancels and replaces the exclusive license agreement" signed by the parties in 1994. The letter, written to Mod–Sod Sports Surfaces, Inc., and Haas, states that "[SynTenniCo] will *continue* to be the exclusive licensee of your U.S. patent, number 4,337,283 except for golf products." [Letter Agreement at ¶ 3 (emphasis added).]

### 2. The Ascendancy of Filled Artificial Turf Systems in the Artificial Turf Market

When FieldTurf's predecessor-in-interest, SynTenniCo, began marketing its filled products in 1997, most artificial turf surfaces were the relatively more expensive conventional systems. The new filled turf systems would prove to be significantly less expensive than their conventional counterparts, including Defendant's Astro-Turf product, as a result of the less expensive raw materials and the lowered ex-

---

resilient particles and from 5 to 75 volume percent fine sand interspersed among the pile elements and on the backing to a substantially

uniform dept at least 1/2 the length of the pile elements."

pense associated with the manufacturing process. Additionally, the amount of raw material needed to produce similarly sized fields was significantly lower for the filled turf systems.[4]

With the popularity of these filled systems, the number of customers has risen dramatically every year since 1998 and the market has seen the ascendancy of the filled field over the traditional conventional systems. FieldTurf's sales increased significantly during that time, and the number of fields sold went from 22 in 1998 to 43 in 1999, 118 in 2000, and a projected 135 (in 2001). That said, Plaintiffs allege that Defendant still holds a 90% market share for the artificial turf market when all conventional and filled systems are included. Defendant alleges and Plaintiffs do not dispute that if the filled system submarket is examined, the reality is that both parties have relatively equal market share. In any event, Gilman has boasted that Field-Turf became Southwest's major competitor, taking substantial market share from Southwest in 2000, decreasing Southwest's sales and reducing its profits.

**3. History of Litigation Between the Parties and Their Predecessors–in–Interest With Regard to the '283 Patent and Other Claims; the Parties' Settlement Agreement**

Over the years, the parties (or their predecessors-in-interest) have competed for contracts on hundreds of artificial turf fields. Some of those contracts have been awarded to Plaintiffs; some have been awarded to Defendant.

In the fall of 1998, Southwest installed an AstroPlay® system (constructed with sand and rubber infill) at the Town and Country soccer complex in Northern Kentucky. At that time, SynTenniCo instituted suit against Southwest and its parent company, American Sports Products Group, Inc. ("ASPG"), in the Covington Division of the Eastern District of Kentucky (the "Covington Action") alleging violations of the Lanham Act and patent infringement.[5]

On May 20, 1999, the parties entered into a settlement agreement to resolve the matter ("Settlement Agreement"), releasing Southwest "from any and all claims, demands, and causes of action, known and unknown, which accrued or are alleged to have accrued up to the date of this Agreement, including the claims in the [Covington] Action." [Settlement Agreement, at 2, ¶ 1(c).] SynTenniCo stated that it had no cause of action against Southwest for the "manufacture and sale" of the AstroPlay® product having an infill composed entirely of resilient particles, including rubber crumb, and expressly waived and released any such action. Further, SynTenniCo agreed that after the expiration of the '283 Patent, AstroPlay® would not be subject to an action for infringement under any patent relating to a filled turf system containing both sand and a resilient particle infill. It is notable that, even while defending the Covington Action, Southwest was changing its AstroPlay®

---

**4.** FieldTurf's President, John Gilman, has stated in deposition testimony that his company's infill products have typically been more expensive than comparable Southwest products, this in spite of the fact that FieldTurf does not use a shock-absorbing pad under its products, a measure that arguably translates into savings for customers. While Plaintiffs describe the price differential as a distinction in quality, Plaintiffs do not deny and a princi-

pal of their distributor, TurfUSA, has testified that FieldTurf's system of distributorship creates a mark-up in price on their systems not experienced by Southwest with its vertically integrated system of manufacture, sale, distribution, and installation of fields.

**5.** *SynTenniCo, Inc. v. American Sports Products Group, Inc., et al.,* Civil Action No. 98–208 (E.D.Ky.—Covington Division).

specifications to provide and market all-rubber infill to its customers worldwide, although specifically in the United States, with the option of a pad under the infill.

In a subsequent jury trial in Austin, Texas (the "Austin Action"), litigation wherein Southwest sued FieldTurf for breach of the Settlement Agreement, FieldTurf raised as a defense that Southwest had admittedly marketed and sold AstroPlay® with a rubber and sand infill outside of the United States after the Settlement Agreement was enacted.[6] Upon testimony indicating that the Settlement Agreement was intended to apply only in the United States and did not extend to foreign instalations, the jury determined that Southwest had not failed to comply with a material obligation of the Settlement Agreement by marketing and selling AstroPlay® with a rubber and sand infill abroad after the Settlement Agreement was in effect.

### 4. Southwest's Marketing Efforts

In its American marketing efforts, Southwest has focused primarily on the lack of a pad in the FieldTurf product. A memorandum sent to Defendant's sales staff referencing FieldTurf as the "No Pad Guys" provided instructions to stress the liability that could result from injuries that could occur on the FieldTurf product without an underlying pad. Putting this campaign into action, Southwest sales staff sent numerous letters to customers referencing this No Pad "mantra."

Southwest also enlisted the services of a public relations firm in its "Play Within the Safety Zone" campaign, directed at the sports industry and the media. In a letter to Southwest, the firm stated the gist of the campaign: "[i]t's time to play hardball. It's time to hit FieldTurf where they have

no line of defense—the long term safety (or lack of) sand and rubber filled turf and its potential to cause life-altering injuries."

Southwest's "research and testing" staff performed ASTM F–355 testing on several FieldTurf installations. The results of these tests demonstrated that those fields were significantly harder than comparable non-FieldTurf fields of comparable age, many FieldTurf sand and rubber installations testing in hardness ranges that exceeded the recommendations for artificial turf safety. By contrast, FieldTurf has relied on the Clegg Tester to test the hardness of its product, a test generally yielding results suggesting that the product as configured is within the recommended safety guidelines for certain surfaces. Defendant claims and has stated to customers that the Clegg Tester is inappropriate for artificial turf as it is designed for natural grass surfaces and does not yield accurate hardness readings.

There is no shortage of evidence that the Southwest sales team advanced this information as it employed its marketing strategy on the offense in the marketplace. Another Southwest employee admitted that he frequently told customers that Southwest felt the sand in the FieldTurf product presented a safety hazard for athletes because of the risk of compaction. Andy Belles, a vice-president for Defendant, testified in deposition that it "would be typical for me to say those that sand-filled or combination-filled fields become hard." [Belles Depo. at 60:22–24.]

The correspondence sent out into the market was described by former Director of Marketing for Southwest, Troy Squires:

[W]e were writing these letters, you know, to any customer that would put down a field without a pad. You know

---

**6.** *Southwest Recreational Industries, Inc. v. FieldTurf, Inc., et al.,* Civil Action No. A–00–CA– 063–55 (W.D.Tex.-Austin Division).

this would basically be the same story that we would say, was that, you know, this is a game that we really recommend that you put a pad down.

[Squires Depo. at 198:23–199:3.]

James Savoca, the head of Southwest' stadium sales program and a prolific letter writer, corresponded with customers concerning the shock absorbent qualities of the FieldTurf ® and AstroPlay ® products. Referencing Southwest's use of the alleged industry standard ASTM F–355 test as the key to "long term player protection," Savoca stated that the importance of a "separate, distinct shock pad" could not be emphasized enough and that using tests other than the ASTM F–355 as a basis for accepting a sand/rubber product would place the customer "in an undefendable legal position." A December 13, 1999 letter exemplifies his tact, challenging the awarding of the field project to FieldTurf and claiming the lack of underlying pad rendered the product unsafe. The letter reads in pertinent part:

> You must be made aware that the synthetic turf you selected has an unacceptable shock absorbency levels initially. It's anyone's guess what will happen in the next 5, 7 or 10 years.

He continued, stating that the recipient "could ask [the] FieldTurf distributor for more data—but their entire experience of installing synthetic turf consists of three or four full sized fields." A July 21, 2000, letter to another customer focused on the need for a pad and stated that with "basically zero test data, [FieldTurf] says a pad is not needed—a very new vendor at that."

Southwest also focused on FieldTurf's public gaffes and never hesitated to share such information with customers. Specifically, Plaintiffs make much of the FieldTurf contract to install two playing fields in the City of Lake Oswego, Oregon. Having received a warranty in the contract that the "unprepared" fields would test below certain hardness limits at certain time intervals using the ASTM F–355 method, Lake Oswego shut down the FieldTurf ® fields as the hardness exceeded the agreed limits. The city claimed that FieldTurf had used the Clegg Tester on "prepared" fields in order to achieve acceptable results. Newspaper articles were published about the debacle and the subsequent lawsuit against FieldTurf.[7] Not surprisingly, Southwest proceeded to provide copies of those articles and report information on the Lake Oswego happenings to customers.[8]

Southwest even turned to FieldTurf's marketing efforts for ammunition in its own marketing campaign, with representatives writing to customers about FieldTurf's showcase fields at the University of Nebraska and Husky Stadium in Washington State. These letters expressed doubts about the hardness test results or the qualifications of the individuals who were affiliated with the choice or promotion of such fields to evaluate the safety of the fields. At other times, Southwest focused on FieldTurf's status as a newcomer to the artificial turf market, allegedly stating that it was doubtful whether or not Plaintiffs would even be around to honor warranties in the future, or the fact that FieldTurf was a *Canadian* company marketing a *Canadian* product.

In the artificial turf market abroad, Southwest was continuing to market its

---

**7.** *Tigard Sportsurfaces, LLC v. SynTenniCo, Inc., et al.,* Civil Action No. 98–1359–JE (D.Oregon).

**8.** Plaintiffs allege that Defendant provided information on ASTM testing as compared to Clegg testing to the City of Lake Oswego. Plaintiffs also allege that, without permission of the City or its consultants, Southwest conducted its own ASTM testing on the fields, publishing the results so obtained to customers and to the city.

AstroPlay ® product with both a rubber infill, as in the United States, and a sand and rubber infill. Southwest's Director of International Business Development, Harry Salomons, has stated in deposition testimony that Southwest also produced nylon fibers and "carpet" in the United States for use in both rubber-only and rubber and sand infill installations outside of the United States.[9] This pile fabric was used not only in both kinds of fields but as a grass-like surface in window-dressing.

Southwest advertises abroad using materials and promotions developed by agencies in the United States that are subsequently shipped to representatives abroad. Southwest also maintains a website, available internationally, advertising their services and products and inviting interested parties to contact FieldTurf. An administrative assistant in Southwest's Texas headquarters retrieves international inquiries submitted via Southwest's website, many of them inquires about rubber-and-sand infill installations, and redirects them to the appropriate regional representatives abroad.

Salomons recounted in his deposition testimony that he has entertained these international representatives and their clients in the United States on a number of occasions during which time the representatives and their clients would view various Southwest installations, including the rubber and sand infill system at the Town and Country site in Kentucky.

**5. The Instant Matter**

Upon these facts, Plaintiffs have alleged that Defendant has participated in conduct in violation of the Sherman Antitrust Act, the Lanham Act, applicable patent law, the Kentucky Consumer Protection Act, and the common law of the Commonwealth of Kentucky. Defendant has moved this Court to grant summary judgment on all counts, by virtue of the prior agreements of the parties and on the evidence at hand.

### APPLICABLE STANDARD OF REVIEW

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving parties, which in this case are the plaintiffs, "cannot rest on [their] pleadings," and must show the Court that "there is a genuine issue for trial." *Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir.1997). In considering a motion for summary judgment the court must construe the facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### DISCUSSION

1. **The Release Effected by the May 20, 1999 Settlement Agreement Extends to All Claims Accrued by That Date and Is Not Limited to Those Claims and Issues Raised in the Covington Action**

In the Covington Action, Plaintiffs' predecessor in interest, SynTenniCo, asserted

---

9. Plaintiffs rely on shipping and invoice records describing rolls of "ASTROPLAY" shipped from sources within the United States to demonstrate the movement of the product from the United States to sites abroad and that billing was initiated from within the United States.

claims of patent infringement involving the '283 Patent, claims under the Lanham Act, and others for tortious interference with economic relations. SynTenniCo advanced claims associated with "sales talk" in that action, stating that Southwest made untrue statements about FieldTurf, its products and/or owners (or false statements about Southwest's products) which statements caused customers to reject the FieldTurf product and enter into contracts with Southwest. Concluding that action and entering into the Settlement Agreement, the parties stated that they "desir[ed] and intend[ed] to settle, conclude and dismiss the claims and disputes which exist between them as expressed in the Action, the Appeal and the Related Actions." [Settlement Agreement at 2, ¶ 7.] The Settlement Agreement between the parties provides in pertinent part:

> [FieldTurf's predecessor] hereby releases and forever discharges Southwest and ASPG, their successors, assigns, officers, directors and insurers, from any and all claims, demands, and causes of action, known and unknown, which accrued or are alleged to have accrued up to the date of this Agreement, including the claims in the [Covington] Action.

[Settlement Agreement, at 2, ¶ 1(c).]

The present action was filed in January 2000, and, two months later, Defendant moved for summary judgment releasing all claims which had been released by the Settlement Agreement. At that time, Plaintiffs expressly denied that their claims in this action had accrued prior to May 20, 1999 and denied that their claims were premised on conduct which occurred before May 20, 1999:

> FieldTurf does not base this action on conduct which occurred prior to May 20, 1999, or claims which accrued prior to May 20, 1999. In fact, in its pleadings, FieldTurf specifies that the conduct at

issue in this action took place after that date.

[Def. Memo. in Opp. To Plaint. Mot. to Dismiss, p. 8]. The Court denied Southwest's motion but held, to the extent that it was demonstrated that the claims in the case had accrued prior to May 20, 1999, Southwest was entitled to summary judgment.

■ In interpreting the Settlement Agreement, the Court is "guided by general rules of contract construction" and "must first resort to the contract language to determine the intention of the parties." *Gilbert v. Monsanto Co.*, 216 F.3d 695, 700 (8th Cir.2000); *FDIC v. Prince George Corp.*, 58 F.3d 1041, 1046 (4th Cir.1995). Only if the terms remain ambiguous after such an examination will the court turn to extrinsic evidence. *Prince George Corp.*, 58 F.3d at 1046.

■ Plaintiffs argue that the Settlement Agreement's reach is limited to those claims involved in and related to the Covington Action or that there is a genuine issue of material fact as to whether Field-Turf intended to release claims other than those involved in and related to the Covington Action by entering into the Settlement Agreement. Specifically, Plaintiffs cite to that portion of the Agreement stating the desire and intent of the parties "to settle, conclude and dismiss the claims and disputes which exist between them as expressed in the Action, the Appeal and the Related Actions." [Settlement Agreement at 2, ¶ 7.] However, the Settlement Agreement clearly provides for release "from any and all claims, demands, and causes of action, known and unknown, which accrued or are alleged to have accrued up to the date of this Agreement, including the claims in the [Covington] Action." [Settlement Agreement, at 2, ¶ 1(c).]

This Court finds that the plain language of the Agreement cannot yield an interpretation as suggested by Plaintiffs. Common sense and a general knowledge of how any agreement functions includes the fact that parties are seeking *quid pro quo.* Anything and everything could arguably serve as consideration in such an agreement, including issues and events not related to the underlying dispute. Reading the Agreement *in toto* reveals that any and all concessions made by either party in the Settlement Agreement certainly relate back to their stated desire to "settle, conclude and dismiss" those issues at bar in the Covington Action and that any concessions made in the Agreement, no matter how broadly sweeping, are consideration therefor.

The parties specifically stated that the claims in the Covington Action were *included* in that body of "any and all claims, demands, and causes of action," clearly contemplating a larger body of "claims, demands, and causes of action" of which the Covington Action was merely a discrete portion. [Settlement Agreement, at 2, ¶ 1(c).] Thus, it is clear to this Court that FieldTurf's predecessor-in-interest conceded not only those claims in the Covington Action but all others accrued at the time of the Agreement. As the language of this Settlement Agreement is clear and unambiguous, the Court need not inquire further into those extrinsic sources suggested by Plaintiffs.

The Sixth Circuit teaches that a plaintiff's right of action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Sevier v. Turner,* 742 F.2d 262, 272 (6th Cir.1984). This is to say that all the events necessary to establish a claim must have occurred such that a suit may be successfully maintained on a particular cause of action. *See Hodge v. Service Mach. Co.,* 438 F.2d 347, 349 (6th Cir.

1971); *Schoonover v. Consolidated Freightways,* 49 F.3d 219, 221 (6th Cir. 1995).

As an initial matter, Plaintiffs allege that the individual acts of which they complain must be viewed as "component parts of a larger concerted effort by Southwest to perpetuate its domination of the market for synthetic grass surface" and that Southwest's attempts isolate those individual examples of alleged wrongdoing as cited in the Complaint and the discovery produced by FieldTurf is inappropriate. [Pl. Resp. at 10.] The "larger concerted effort" of which Plaintiffs speak is the alleged antitrust violation. Plaintiffs correctly point out that "[i]n the context of a continuing scheme to violate the antitrust laws, a cause of action accrues to the plaintiff each time the defendant engages in conduct that harms the plaintiff." *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.,* 669 F.2d 490, 494 (7th Cir.1982). The repeated violation of a plaintiff's interests by a continuing antitrust violation would likely make it appropriate to reach back beyond the date of the Settlement Agreement to completely understand the breadth and reach of the violation as it continued to accrue after May 20, 1999. *See DXS, Inc. v. Siemens Medical Systems, Inc.,* 100 F.3d 462, 467 (6th Cir. 1996). This is to say that simply because certain incidents of a continuing violation accrued prior to a cut-off date imposed, somewhat artificially, by settlement agreement or other such device, the Court would not necessarily be amiss in considering them where the antitrust wrong continued to accrue after that date.

That said, the Court remarks that Plaintiffs have failed to adequately state a claim for the antitrust violations on which this argument is premised. As determined hereinbelow, Plaintiffs have failed to allege the types of injury necessary or certain

requisite elements of such a claim. Accordingly, this Court need not now consider which incidents, if any, would fall within the realm of consideration as predicate acts of an antitrust violation. Such circumstances absent, this Court notes the terms of the Settlement Agreement and shall not consider those actions having accrued prior to May 20, 1999.

## 2. Plaintiffs Fail to Allege Facts Sufficient to Sustain Their Claim Under the Sherman Antitrust Act and KY. REV. STAT. 367.175 [10]

Plaintiffs contend that Defendant violated § 2 of the Sherman Act by monopolizing or attempting to monopolize the market for "synthetic turf sports fields." 15 U.S.C. § 2. Primarily, Plaintiffs argue that Defendant engaged in "predatory pricing" to establish or maintain its alleged monopoly, then engaged in various anti-competitive predicate acts, including patent infringement, "disparagement," unfair competition, and "prosecution of baseless trademark claims while possessing monopoly power."

Causes of action for monopolization arise upon (1) certain conditions, i.e., a defendant's possession of "monopoly power" or possession of sufficient market power that there is a dangerous probability of the defendant attaining monopoly power, and (2) where the party has acquired that power through willful conduct, i.e., unlawful predicate acts (as distinguished from acquiring that power as a consequence of a superior product, business acumen or historical accident).[11] *United States v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). A party cannot be liable for attempted monopolization under § 2 of the Sherman Act "absent proof of a market and specific intent to monopolize." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

It is axiomatic that a firm cannot monopolize a market in which it does not compete, and it is imperative to understand which market is addressed in order to measure a defendant's ability to lessen or destroy competition. *Walker Process*

10. Defendant argues that Plaintiffs lack standing to pursue a claim under KY. REV. STAT. 367.175, the antitrust provision of the Kentucky Consumer Protection Act. While it has been stated that the Act "provides no civil remedies to private plaintiffs for violations of 367.175," it is also stated that "Kentucky Consumer Protection Act was broadly designed to curtail unfair, false misleading or deceptive practices in the conduct of commerce." *Kentucky Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F.Supp.2d 755, 773 (W.D.Ky. 1998); *Com. ex rel. Stephens v. North American Van Lines, Inc.*, 600 S.W.2d 459, 462 (Ky.App.1979). Considering such a broad reading and the statement of a federal antitrust claim, Judge Wilhoit's order of October 6, 2001, stated that FieldTurf had standing to pursue a claim under KY. REV. STAT. 367.175. Accordingly, the Court will not now dismiss the state antitrust claim for lack of standing.

As the antitrust law of the Commonwealth is so similar to its federal counterpart, the

Sherman Antitrust Act, and may be interpreted where appropriate with regard to federal law, the Court shall dispatch with the claim under KY. REV. STAT. 367.175 upon its analysis of the federal antitrust claim as stated in this order. *See Mendell v. Golden–Farley of Hopkinsville, Inc.*, 573 S.W.2d 346, 349 (Ky.App. 1978).

11. Where a defendant allegedly acquires or maintains monopoly power, the commission of the unlawful predicate act must either itself establish monopoly power or occur at a time when the defendant already possesses monopoly power. *See Re/Max Int'l., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir.1999). Where the defendant allegedly attempts to monopolize, the predicate act must occur at a time when the defendant is dangerously close to establishing monopoly power. *See White and White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 506 (6th Cir.1983).

*Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *see Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1061–62 (2nd Cir.), *reversed and remanded on other grounds,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *see White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 104–105 (4th Cir.1987), *Mercy–Peninsula Ambulance, Inc. v. County of San Mateo,* 791 F.2d 755, 759 (9th Cir.1986). In order to determine the relevant product market, one must utilize the "reasonable interchangeability" standard. *White and White, Inc. v. American Hosp. Supply Corp.,* 723 F.2d 495, 500 (6th Cir.1983). This is to say, one must identify those products or services that are either (1) identical to or (2) available substitutes for the defendant's product or service. *Id.* (citing *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). The Sixth Circuit teaches that:

> ...reasonable interchangeability may be gauged by (1) the product uses, *i.e.,* whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service.

*Id.* at 500–01 (internal citation omitted).

■ "In defining a relevant product market, the goal is 'to delineate markets which conform to areas of effective competition and to the realties [*sic*] of competitive practice.'" *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 734 F.2d 1157, 1166 (6th Cir.1984) (quoting *L.G. Balfour Co. v. F.T.C.,* 442 F.2d 1, 11 (7th Cir.1971)) (no error in designating retail rather than wholesale power market as relevant product market where there was no evidence that parties ever competed in or intended to compete in wholesale power market). So it is that in measuring the

relevant product market, one may also utilize the submarket criteria as taught in *Brown Shoe Co. v. United States:*

> A submarket may be determined by examining such practical indicia as (1) industry or public recognition of the submarket as a separate economic entity, (2) the product's peculiar characteristics and uses, (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors. *Id.* at 325, 82 S.Ct. at 1523.

*Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (district court, recognizing industry practice and public perception, appropriately found separate footwear markets, later characterized as submarkets, of "men's," "women's," and "children's" shoes); *White and White, Inc.,* 723 F.2d at 501—502; *see also Int'l. Boxing Club of New York v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959) (affirming a narrower product market than "professional boxing" as supported by evidence of far greater interest in championship boxing by the public and broadcasters; further stating that evidence showed that nonchampionship fights were not "reasonably interchangeable" with championship fights, "which is the basic inquiry of the standard product market test").

Looking to the product market in which FieldTurf and Southwest participate, determining the relevant market under the "reasonable interchangeability" standard seems initially straightforward for the product market would appear to be artificial turf fields upon which sports are played. Such fields could be described as relatively flat swathes of artificial turf substituting for natural grass, and accommodating certain sporting activities. Upon considering consumer response, or "crosselasticity," consumer sensitivity to price levels at which they elect substitutes

for the defendant's product or service delimits the relevant product market in this matter. The type of artificial turf systems at issue are those styled "filled." Both parties see this market as "growing" and rapidly replacing older, more traditional, and more expensive artificial turf systems.

■ This is to say that based on the admittedly lower price for this filled product and the fact that Plaintiffs and Defendant find themselves locked in a battle over this submarketplace, a battle in which Plaintiffs are holding their own in fiercely developed competition with Defendant, a smaller relevant product market exists than that otherwise stated by Plaintiffs. Thus, the broader and more basic substitutability recognized in the first place-a field for a field must yield to the lack of "cross-elasticity" between the submarket for filled artificial turf systems, like Field-Turf ® and AstroPlay ®, and those other products available within the larger category of artificial turf systems. Plaintiffs have not provided evidence that Defendant was monopolizing the filled turf submarket or that Defendant was even dangerously close to monopolizing the submarket. Rather, the evidence demonstrates relatively equal market share on the part of Plaintiffs and Defendant in this relevant product submarket.

However, even if this Court assumes, *arguendo*, that Plaintiffs' suggested market (all synthetic turf sports surfaces in excess of 25,000 feet) is the proper one and that Defendant controlled approximately 90% of that market, Plaintiffs have failed to demonstrate that Defendant, in addition to its alleged high market share, had the ability to control prices or exclude competition. *American Council of Certified Podiatric Physicians & Surgeons v. American Board of Podiatric Surgery*, 185 F.3d 606, 622–23 (6th Cir.1999). The Court notes that overall average prices were declining in the artificial turf business during the relevant period, and that Plaintiffs have not demonstrated how Defendant could have unilaterally affected the supply of raw materials, customers, or the construction capabilities in the artificial turf business to the detriment or exclusion of other competitors. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir.1997).

■ Antitrust plaintiffs must prove an antitrust injury of the type that the antitrust laws were intended to prevent and that flows from that which makes a defendant's acts unlawful.[12] The injury should

---

12. For example, "[l]ow prices which remain above predatory levels do not constitute an antitrust injury because they benefit consumers regardless of how they are set." *Louisa Coca–Cola Bottling Co. v. Pepsi–Cola Metropolitan Bottling Co., Inc.*, 94 F.Supp.2d 804, 814 (E.D.Ky.1999). "Predatory pricing" becomes actionable where the defendant prices its products below the cost of producing them for the purpose of driving its competitors out of business so that the defendant may then raise prices to anticompetitive levels and recoup its past losses. *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222–24, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 823 (6th Cir.1982). Where the defendant's prices are below the "average variable costs" of producing the product, a *prima facie* case of predatory pric-

ing is established and the burden shifts to the defendant to show that the pricing was justified. *D.E. Rogers Assoc., Inc. v. Gardner–Denver Company*, 718 F.2d 1431, 1436 (6th Cir.1983). Where the pricing is above "average variable costs" but below the defendant's "total costs" it is presumed that the pricing scheme is not predatory and the plaintiff may not prevail absent detailed and convincing economic analysis establishing a clear correlation between the pricing scheme and an untimely anticompetitive result. *Id.* When the defendant's prices are above the "average total costs" of producing the product, a claim for predatory pricing will not survive. *Id.*

Defendant's pricing remained not only above its average variable costs, but also above its average total costs. This is to say that between May 1999 and the end of 2000, Southwest was earning "net profits" (its sales

reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

■■■ To be actionable under antitrust statutes, the defendant's actions must harm *competition*—not just one competitor in the form of mere economic injury. *Valley Prods. Co. v. Landmark,* 128 F.3d 398, 402 (6th Cir.1997); *see, e.g., Louisa Coca–Cola Bottling Co. v. Pepsi–Cola Metropolitan Bottling Co., Inc.,* 94 F.Supp.2d 804 (E.D.Ky.1999) (plaintiff failed to state an antitrust injury and district court dismissed the case on summary judgment where plaintiff sued its chief rival alleging monopolization of the local soft drink market by virtue of money paid by soft drink companies to retailers to be used for local advertising and promotion as it resulted in lower prices). The Sixth Circuit Court of Appeals teaches that:

> [T]he antitrust plaintiff must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions.

*Tennessean Truckstop v. NTS, Inc.,* 875 F.2d 86, 88 (6th Cir.1989) (citation omitted). Failure to allege an injury to competition is reason enough to dismiss an antitrust claim. *Id.* at 90–91.

Both Plaintiffs and Defendant indicate that competition increased and average prices were reduced in the filled turf industry during the relevant time period in this matter. Gilman himself testified that once filled turf became an accepted product in 1998, competitors or "imitators" began entering the market. Plaintiffs identify no fewer than eleven new "imitators" that introduced products in 1999 and 2000.[13] Further and according to Plaintiffs' own information, the number of sales of fields per year has risen dramatically between 1998 and 2001, and Plaintiffs' expert, James Langenfeld, finds that increased sales of cheaper filled turf systems have resulted in a decrease in the average price for artificial turf since May 20, 1999.

Based on this evidence, Defendant argues that the Amended Complaint does not allege an antitrust injury or any harm to competition and terms the losses of jobs or contracts of which Plaintiffs complain as losses of business by FieldTurf, not a loss of business because of reduction in competition. This Court does not find any reason based on the evidence presented by either party to determine otherwise. For all of the aforementioned reasons, the Court grants Defendant's motion for summary judgment on the issue of antitrust claims, both those alleged under the Sherman Antitrust Claim and the Kentucky Consumer Protection Act, Ky. Rev. Stat. 367.175.

revenues exceeded its total costs)—*making,* not losing, money in the arguably relevant time period. Notably, FieldTurf's expert, J. Donald Fancher, indicated that during the relevant time Defendant maintained profit margins around 20%. It follows, inexorably, that Plaintiffs' claims premised on predatory pricing would necessarily fail, as well.

**13.** Entry of new competitors proves the existence of a competitive market and the absence of barriers to entry. *Richter Concrete*

*Corp.,* 691 F.2d at 827; *Barr Labs. Inc. v. Abbott Labs.,* 978 F.2d 98, 113–14 (3rd Cir. 1992). FieldTurf has suggested that the fact that certain customers excluded competitors who lacked certain "experience" requirements demonstrates a barrier to entry into the artificial turf market. However, experience requirements are not substantial barriers to entry as they apply to everyone equally. *See Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421 (9th Cir.1995).

**3. Plaintiffs Fail to Allege Facts Supporting Its Claims of Lanham Act Violations Because Statements Made by Defendant Are Not Literally False and Evidence Does Not Demonstrate that Potential Customers Were Misled or Deceived**

The Lanham Act serves to protect harm to a plaintiff's commercial interests caused by a competitor's false statements. *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 563 (5th Cir.2001); *Hutchinson v. Pfeil*, 211 F.3d 515, 520 (10th Cir.2000). The relevant portions of the Lanham Act provide that:

> [a]ny person who, on or in connection with any goods or services...uses in commerce any...false or misleading description of fact, or false or misleading representation of fact, which...misrepresents the nature, characteristics, [or] qualities...of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

▆▆▆ To recover for a claim of "false advertising" under the Lanham Act, a plaintiff must show that (1) the defendant made a false or misleading statement of fact concerning his own product or another's; (2) the statement actually deceived or tended to deceive a substantial portion of the intended audience; (3) the statement was "material" in that it will likely influence the deceived customer's purchasing decisions; (4) the statement was introduced into interstate commerce; and (5) there is a causal link between the statement and harm to the plaintiff. *American Council*, 185 F.3d at 613.

▆▆▆ To be actionable, a statement must be a "statement of fact," in other words "a specific and measurable claim, capable of being proved false." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir.2000), *cert. denied*, 532 U.S. 920, 121 S.Ct. 1355, 149 L.Ed.2d 285. In other words, a statement of fact can be adjudged true or false through empirical verification. *Presidio Enters, Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674 (5th Cir.1986). Neither statements of opinion nor "puffing statements" are actionable.[14] *American Council*, 185 F.3d at 615 and *Pizza Hut*, 227 F.3d at 495.

▆▆▆ Where a false or misleading statement is literally false, the plaintiff does not need to establish proof that consumers were actually deceived by the statements in order to recover under the Lanham Act, but such deception is presumed from the literal falsity. *Balance Dynamics Corporation v. Schmitt Industries, Inc.*, 204 F.3d 683, 690 (6th Cir.2000) (quoting *American Council*, 185 F.3d at 614). If the factual statement is literally true or too ambiguous to be literally false, it is not actionable unless it is also misleading and actually deceives customers. *American Council*, 185 F.3d at 614. Further, "[w]hen construing the allegedly false or misleading statement to determine if it is actionable under section 43(a), the statement must be viewed in the light of the overall context in which it appears." *Pizza Hut, Inc.*, 227 F.3d at 495 (citing *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2nd Cir.1986); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir.1997)).

---

**14.** "Puffing" is a claim of general superiority or an exaggerated blustering or boasting statement. *Pizza Hut*, 227 F.3d at 496.

FieldTurf alleges that by "literally false" statements to customers, Southwest disparaged FieldTurf and FieldTurf® products in a number of ways: (1) by accusing the FieldTurf® product of being unsafe for American football because it lacked an underlying pad and, therefore, allegedly has not measured up to certain testing standards creating the potential for litigation by players injured on such fields; (2) by making allegedly disparaging comments about FieldTurf's showcase fields; (3) by utilizing the controversy surrounding an installation at Lake Oswego, Oregon to disparage FieldTurf and attempting to interfere with FieldTurf's contract at that installation; and (4) by publically questioning FieldTurf's longevity and its ability to honor warranties.

Insofar as Defendant has made reference to the potential for future legal action by those injured on fields that are produced by Plaintiffs, for whatever reasons such legal action should arise, those statements are predictions, not specific or measurable nor capable of being proved false. The same analysis applies to statements concerning Plaintiffs' anticipated longevity and ability to honor warranties for the FieldTurf® product, premised on the relative youth of the company. They are predictions of future performance, not specific or measurable statements so as to be actionable under the Lanham Act. Similarly, Defendant's comments about Plaintiffs' showcase field installations are not actionable specific or measurable statements. Rather they state Southwest's opinion of those involved in the field selection process and the product itself. Try as

it might, this Court cannot find that Southwest has expressed more than a prediction or opinion so as to actionably mislead others with regard to the fields installed by FieldTurf or the company's future in the industry.

With regard to statements about the Lake Oswego installation and the controversy surrounding it, neither the protestations of Plaintiffs nor the power of this Court can undo history. The events that Defendant describes to customers did occur and are a matter of public record, not "literally false" statements as alleged by Plaintiffs.

Finally, with regard to those statements concerning whether the Plaintiffs' product is or is not safe for American football and the relative superiority of Defendant's own product, it is taught that when a defendant has buttressed a claim of superiority by attributing it to the results of scientific testing, a plaintiff must prove only "that the tests [relied upon] were not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited." [15] *United Industries Corp. v. Clorox Co.*, 140 F.3d 1175, 1182 (8th Cir.1998) (quoting *Rhone–Poulenc*, 93 F.3d at 514–15).

In the matter at hand, Plaintiffs have not suggested that the ASTM testing relied upon by Defendant was necessarily unreliable for establishing the rate of shock absorbency and related safety conclusions drawn therefrom.[16] Furthermore, this Court finds that those statements taken from FieldTurf's witnesses that other

---

**15.** To "ensure vigorous competition and to protect legitimate commercial speech, courts applying this standard should give advertisers a fair amount of leeway, at least in the absence of a clear intent to deceive or substantial consumer confusion." *Rhone–Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir.1996).

**16.** The Court further remarks that the relative safety of Defendant's own product with a pad, insofar as it is supported by ratings on appropriate tests, accomplishes little more than the type of "puffery" one anticipates in any competitive sales environment.

testing procedures were also accurate or usable cannot, by themselves, undermine the alleged usefulness or acceptance of the ASTM testing referenced by Defendant.

In any event and in spite of the negative tenor of all of Southwest's statements, they are not actionable in this matter as Plaintiffs have failed to provide any evidence suggesting that customers were, in fact, misled by these statements. Accordingly, such claims are appropriately dismissed.[17]

Plaintiffs have demonstrated that much has been said about their product and that Southwest has not spoken of it in glowing terms. However, the *poids net* of the evidence provided to this Court notwithstanding, Plaintiffs have not demonstrated that any of the statements were literally false or, even if literally true or ambiguous but misleading, that customers were actually misled by the statements in making their choice between the competing products. It is clear that FieldTurf wants nothing more in the world than for Defendant to stop talking about their product, but their desire cannot yield relief under the Lanham Act on the facts at hand.

### 4. While Plaintiffs May Have Standing With Regard to the '283 Patent, FieldTurf Has Failed to Identify Actionable Infringing Behavior and the Claim Will Be Dismissed

#### a. Standing

██ Federal statute provides that only a patentee has a remedy by civil action for patent infringement. 35 U.S.C. § 281. "Patentee" is defined as the person to whom the patent issued and his or her successors in title. 35 U.S.C. § 100(d).

Thus, the statute limits standing in a patent infringement case to a party holding legal title to the patent at the time of infringement. *See, e.g., Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574, 1578–79 (Fed.Cir.1991). As it is axiomatic that one cannot grant what does not belong to oneself, a basic principle applying with full force to patents, "legal title" to the patent at the pertinent time must be established in order to establish standing to seek remedy for patent infringement. *See Prima Tek II, L.L.C. v. A–Roo Co.*, 222 F.3d 1372, 1382 (Fed.Cir.2000).

██ "A conveyance of legal title by the patentee can be made only of the entire patent, an undivided part or share of the entire patent, or all rights under the patent in a specified geographical region of the United States."[18] *Rite–Hite Corp. v. Kelley Co., Inc.* 56 F.3d 1538, 1551–1552 (Fed.Cir.1995) (citing *Waterman v. Mackenzie*, 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923 (1891)). "A transfer of any of these is an assignment and vests the assignee with title in the patent, and a right to sue infringers," but any less of a transfer is not an assignment of legal title but a mere license giving the licensee no right to sue for infringement at law in the licensee's own name. *Id.*

When the patent was issued on June 29, 1982, the Mod–Sod Partnership owned the patent by virtue of the December 29, 1980 assignment and operation of law. *See Filmtec Corp. v. Allied–Signal, Inc.*, 939 F.2d 1568 (Fed.Cir.1991). Haas's testimony about the subsequent assignment to Mod–Sod Corp. creates an issue of material fact with regard to whether or not

---

**17.** Plaintiffs have relied only on the testimony of John Ingram to substantiate that consumers were misled by Southwest's alleged statements. Such testimony by Ingram has been excluded from this matter as hearsay on the Court's order of November 4, 2002.

**18.** "In the first and third cases, the assignee may sue in its name alone; in the second case, it may sue jointly with the assignor." *Rite–Hite Corp.*, 56 F.3d at 1552 n. 10 (*citing Waterman*, 138 U.S. at 255, 11 S.Ct. 334).

rights in the '283 Patent were successfully transferred to the parties in the matter at hand. Assuming, for the purposes of summary judgment, that such an assignment from the Mod–Sod Partnership to the Mod–Sod Corp. occurred, it is the opinion of this Court that the "letter agreement" that Mod–Sod Sports Surfaces, Inc. and Haas granted to SynTenniCo, as licensee, the right to practice the invention contained within the '283 patent within the previously agreed upon territory and impliedly promised that others would be excluded from practicing the invention within that territory, except as related to the practice of the invention with regard to golf products. Accordingly, insofar as Mod–Sod Corp. and Haas had the requisite "legal title" to the patent and SynTenniCo has transferred the rights obtained in the "letter agreement" to Plaintiffs, Plaintiffs can state their status as "patentee" with regard to standing to sue for infringement of the '283 patent.

However, even as this Court has determined that Plaintiffs could have standing to bring this claim as "patentees," the Court must now dismiss the claims for patent infringement.

### b. The Doctrine of Claim Preclusion Bars Plaintiffs' Claims of Patent Infringement with Regard to U.S. Installations by Defendant

 The doctrine of claim preclusion or "true" *res judicata* teaches that parties are precluded "from advancing in a new action all claims or defenses that were *or could have been* raised in a prior proceeding in which the same parties or their privies were involved, and that resulted in a judgment on the merits." *J.Z.G. Resources, Inc. v. Shelby Ins. Co.*, 84 F.3d

211, 214 (6th Cir.1996) (quoting *In re PCH Associates*, 949 F.2d 585, 594 (2nd Cir. 1991) (emphasis added)). Claim preclusion serves not only to bar parties from relitigating issues that were actually litigated but also to prevent from "relitigating issues that could have been raised in an earlier action." *Id.* (citing *Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948); *In re PCH Assocs.*, 949 F.2d at 594; *Westwood Chem. Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir.1981)).

Claim preclusion in patent infringement cases is defined as "a valid and final judgment rendered in an action extinguish[ing] the plaintiff's claims pursuant to the rules of merger [and] bar".[19] *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 478 (Fed.Cir.1991). "[T]he claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction or series of connected transactions out of which the action arose." *Id.* Thus, the Court must first focus on whether the second suit rests upon the same transactional facts as the first suit. *Id.* at 479.

The Federal Circuit teaches that the requirement of the same transactional facts is satisfied when the devices at issue in the second suit are essentially the same as the device(s) at issue in the first suit. *Id.* at 479–80. So it is in the matter at hand, wherein Plaintiffs continue to claim that Southwest's AstroPlay® product, however configured, infringes claim 1 of the '283 patent.

 As recounted above, Plaintiff's predecessor in interest, SynTenniCo, sued Defendant for infringement of the '283

---

19. A dismissal with prejudice is a final adjudication on the merits. *England v. Automatic Canteen Co.*, 349 F.2d 988, 989 (6th Cir.1965), cert. denied, 383 U.S. 925, 86 S.Ct. 928, 15 L.Ed.2d 845 (1966) (dismissal of a suit with prejudice bars subsequent action seeking the same relief); *see also Hallco Mfg. Co.*, 256 F.3d at 1297.

Patent in the Covington Action. Following mediation, the parties signed a Settlement Agreement on May 20, 1999. Section 1, titled "SynTenniCo's Agreements," states that SynTenniCo has no cause of action against Southwest for the "manufacture and sale" of the AstroPlay ® product having an infill composed entirely of resilient particles, including rubber crumb, and expressly waives and releases any such action. Further, SynTenniCo agreed that after the expiration of the '283 Patent, AstroPlay ® would not be subject to an action for infringement under any patent relating to a filled turf system containing both sand and a resilient particle infill.

This Court finds it quite clear that the Settlement Agreement permits the Defendant to produce its AstroPlay ® product, where appropriately modified to contain only a resilient particle infill, within the United States without fear of infringing the '283 Patent. Further, such an Agreement anticipates the eventual expiration of the '283 Patent and subsequent inflow of products similar, if not identical, to that described in the claims of the patent.

Whereas any claims for patent infringement were extinguished in that proceeding by virtue of the Settlement Agreement and a subsequent dismissal of that matter with prejudice, Plaintiffs are barred by the doctrine of claim preclusion from attempting to relitigate any claims for infringement within the United States premised on the '283 Patent with regard to the AstroPlay ® product having a composition entirely of resilient particles. Much is made of the pile length in these installations, but Plaintiffs have failed to offer evidence of AstroPlay ® systems installed in the United States during the period following the Settlement Agreement release of all claims accruing prior to May 20, 1999 but before the expiration of the '283 Patent having other than resilient particles therein.[20] Accordingly, those claims related to such products during such times are *res judicata* and are summarily dismissed.

Further, Plaintiffs cannot state an infringement claim for any sand and rubber infill systems produced by Defendant upon expiration of the '283 Patent per applicable law and the Agreement.

**20.** Plaintiffs' novel theory that the Settlement Agreement states that all AstroPlay ® is, by definition, in violation of Claim 1 of the '283 Patent (by virtue of the pile length stated therein) is bold but nonsensical. Following FieldTurf's interpretation, if the paper on which this order is printed or the computer monitor on which it appears were called "AstroPlay," they would infringe the '283 Patent notwithstanding their lack of an "infill" or usefulness as a location for sporting events. This Court will not stand for such obnoxious and inflated interpretation of the clear language of an agreement between the parties.

For the same reason, the Court declines to apply the doctrine of equivalents as suggested by Plaintiffs. The doctrine prevents infringers from creating the infringing product with only insubstantial changes to avoid directly replicating the exact claims of the patent and to disingenuously avoid the prohibitions of the patent laws. *Graver Tank & Mfg. Co. v.* *Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Regardless of the length of the pile in the allegedly infringing installations, which by Defendant's accounts would exceed the length claimed in the invention described in the '283 Patent, so long as Defendant's product did not contain the sand infill, it would both lack an element required by the patent as intimated in the Settlement Agreement. Where the pile length was less than or in excess of the 1/2 to 2 inch length stated in Claim 1 of the '283 Patent, this Court is not convinced that doctrine of equivalents is implicated as FieldTurf has stated that even minor changes in the length of the pile elements substantially affect performance. This is to say that, as FieldTurf itself suggests, the installation would no longer perform as the patented invention was designed to perform and such installations could not be the patented invention.

§ 271(a) provides that one who offers to sell the patented invention within the United States *during the term of the patent* infringes the patent. 35 U.S.C. § 271(a). Once a patent expires, there is no longer a patent to infringe, which is to say that if sand were added to an otherwise all-rubber infill turf system after the expiration of the '283 patent, there could necessarily be no infringement, even if the resulting product satisfied the claims of the '283 Patent.

■ Even where Defendant offered to add sand after the '283 Patent expired but made such an offer before the expiration of the '283 Patent, such an offer does not constitute a violation of the governing statute, 35 U.S.C. § 271(a).[21] § 271(i) provides that an " 'offer for sale' or 'offer to sell' by a person other than the patentee, or any designee of the patentee, is that in which the sale will occur before the expiration of the term of the patent." 35 U.S.C. § 271(i); *see Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 (Fed.Cir. 2000). The Court finds that FieldTurf has not provided evidence indicating that any such "sales" of such "sand additions" took place prior to the expiration of the '283 Patent. Rather, FieldTurf recognizes that the offers at bar contemplated that sand would be added to the infill and, thus, the sale would occur, i.e., be completed by Southwest, only upon the expiration of the '283 Patent. Accordingly, those claims for patent infringement resting upon the offer to add sand to the infill in Defendant's U.S. installations must fail and will be dismissed.

**c. The Geographic Scope of the Settlement Agreement is Limited to the United States, and the Settlement Agreement is Not Implicated with Regard to Those Installations Outside the United States; However, Plaintiffs Have Not Stated a Claim for Infringement of the '283 Patent with Regard to Foreign Installations by Defendant**

It is taught that issue preclusion applies "(1) when the issue presently asserted was actually litigated in an earlier trial, (2) when it was actually and necessarily determined by a court of competent jurisdiction, and (3) when preclusion in the second trial does not work an unfairness." *Putnam Pit, Inc. v. City of Cookeville, Tenn.*, 221 F.3d 834, 840 (6th Cir.2000) (quoting *United States v. Berman*, 884 F.2d 916, 922 (6th Cir.1989)).

In a prior action between the parties in Austin, Texas, a jury held that Southwest's foreign installation of an otherwise infringing artificial turf product was not in violation of the Settlement Agreement, effectively determining that the application of the Settlement Agreement was limited in geographic scope to the United States. Similarly, in the matter at hand, Defendant asserts that the alleged infringements of the '283 Patent by AstroPlay® installations abroad are not governed by the provisions of the Settlement Agreement.

From all appearances, this is the same issue litigated in the Austin Action where it was "actually and necessarily" decided by jury trial in a court of competent jurisdiction. Further, this Court does not find that such preclusion works an unfairness

---

**21.** To decide otherwise would effectively extend the term of a patent beyond its expiration date by requiring competitors to wait until after the expiration to "gear up" to offer competing and no-longer infringing products in the marketplace, a result that this Court finds untenable with the *limited* monopoly, both temporally and substantively, permitted under patent law.

in the matter at hand. Insofar as Plaintiffs' predecessor-in-interest did not include foreign installations as consideration in the Settlement Agreement bargain, Plaintiffs cannot derive such a benefit out of the ether. Accordingly, neither Southwest nor FieldTurf were bound by the terms of that Settlement Agreement with regard to their actions outside of the geographic limits of the United States. As the claims of patent infringement outside of the United States are not contemplated by the Settlement Agreement, the Court will now consider the allegations of patent infringement related to installations outside of the United States independent of the Settlement Agreement terms.

 With regard to those installations at issue outside of the United States—made, used, or sold in foreign countries—the Court must recognize that the "right conferred by a patent under our law is confined to the United States and its territories, and infringement of this right cannot be predicated on acts wholly done in a foreign country." *See Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 650, 35 S.Ct. 221, 59 L.Ed. 398 (1915); *Waymark Corp. v. Porta Systems Corp.*, 245 F.3d 1364 (Fed.Cir.2001); *Ortho Pharm. Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1033 (Fed.Cir.1995). This is not to say, however, that certain actions taken within the United States cannot lead to liability for patent infringement for an infringing product otherwise made, used, or sold outside of the United States. § 271(a) is intended to prevent infringers from "generating interest in a potential infringing product to the commercial detriment of the rightful patentee." *See 3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373, 1379 (Fed.Cir.1998). In order to prevail on such a theory of patent infringement, Plaintiffs must demonstrate that there was (1) an offer to sell made in the United States, a violation of Section 271(a), (2) that Defendant supplied or caused to be supplied in or from the United States a substantial portion of the components of the patented invention in violation of Section 271(f)(1), or (3) that Defendant supplied or caused to be supplied in or from the United States a component of the patented invention that is especially made or adopted for use in the invention and is not a staple article or commodity of commerce suitable for noninfringing use per 271(f)(2).

Southwest admitted in the Austin Action and does not otherwise dispute that immediately after the Settlement Agreement was signed that Southwest advertised and made available outside of the United States an AstroPlay ® surface with sand and rubber infill. FieldTurf alleges that Defendant marketed that infringing fill system from within in the United States and sold certain pile fabrics as attached to a flexible backing from the United States for use abroad during the relevant time period in violation of relevant U.S. patent law. Specifically, Plaintiffs allege that Southwest contacted customers, received proposals, sent out quotations, made shipping and customs arrangements, instructed on delivery and installations, and had shipped and accepted payment for the pile fabric and flexible backing components of the AstroPlay ® product supplied from the U.S.

This Court is not convinced that Plaintiffs have set forth evidence to create a material issue of fact with regard to any offer to sell an allegedly infringing product from within the United States as required under 35 U.S.C. § 271(a). The offer to sell the '283 patented invention would need to be accomplished within the United States in order to fall under the blanket of protection afforded by § 271(a). *See Rotec Indus., Inc.*, 215 F.3d 1246.[22] Such a sale

---

**22.** Even where prospective customer visited
defendant's headquarters in the United States

would require the traditional commercial offer for a sale under contract law, or communicate to the offeree a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* at 1252–53 (quoting Restatement (Second) of Contracts § 24 (1979)). This is to say that directing such communications and other marketing materials from within the United States is not necessarily excluded as an offer for sale within the meaning of § 271(a). *See 3D Systems, Inc.,* 160 F.3d at 1379 (price quotation letters could be regarded as "offers to sell" where letters described allegedly infringing item and price at which it could be purchased).

While Plaintiffs offer evidence that the Defendant met in the United States with representatives from overseas who were soliciting offers for AstroPlay ® to be accepted for installation and use at overseas playing fields, the evidence suggests that these overseas visitors were present in the United States merely to observe the artificial turf installations with their own clients. Even viewing these visits in the light most favorable to the Plaintiffs, mere visits by other parties would be insufficient to evidence an extension of the requisite commercial offer by Defendant to sell any infringing product during these visits by overseas representatives and their clients.

More troubling are Plaintiffs' allegations based on the deposition testimony of Harry Salomons and documents produced suggesting that quotes, pricing information and orders for the AstroPlay ® product were directed and accepted by Southwest from its home office in Leander, Texas, and that Southwest faxed offers and acceptances from its offices in the United States to installations overseas.

However, upon reading the deposition transcript of Salomons, upon which Plaintiffs rely in substantial part, this Court finds that Salomons's testimony describes a system of deflecting inquiries from abroad to representatives outside of the United States, a practice that hardly reveals the requisite content manifesting an "offer for sale" as sought by Plaintiffs.

Further, Salomons's testimony about the elements of the foreign installations that are produced in the U.S., taken in context, show only that the pile fiber, termed a "carpet" therein, were produced in and exported from the United States. Even where his terminology might be otherwise construed, the Court notes that the documents relied upon in Plaintiff's Response are shipping documents and invoices for rolls of a product referenced only as "AstroPlay," paint, thread or nylon, and adhesive. Assuming, in the absence of proof otherwise, that a completed filled system cannot be shipped in rolls, the referenced documents reveal only that Defendant shipped and provided invoices for the pile fiber system described by Defendant.

■ Insofar as any offers to sell the AstroPlay ® pile fabric, an element of the allegedly infringing installations, were made within the United States, Plaintiffs' argument is insufficient to rise to the level of patent infringement notwithstanding the evidence presented. An offer to sell a component of a patented invention is not, as a matter of law, an offer to sell the patented invention. *See Rotec Indus., Inc.,* 215 F.3d at 1250 & 1255. Nor is the AstroPlay ® pile fabric a "staple article or

---

weeks before defendant submitted a bid, defendant worked on bid proposal and prepared pricing information in the United States, the Federal Circuit found the actual offer to sell took place *outside* the United States and other

activities were insufficient as matter of law to establish an "offer for sale" within the boundaries of the United States of the infringing equipment at issue. *Rotec Indus., Inc.,* 215 F.3d 1246.

commodity of commerce" unsuitable for substantial uninfringing use as the pile fabric has uses in addition to those in the patented invention. *See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,* 911 F.2d 670, 674–75 (Fed.Cir.1990) (*citing Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 199, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980)).

§ 271(f)(1) provides as follows:

Whoever without authority supplies or causes to be supplied in or from the United States *all or a substantial portion* of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.[23]

35 U.S.C. § 271(f)(1) (emphasis added). The language of § 271(f)(1) speaks in terms of "components" (plural) that are combined or are to be combined as opposed to the language of § 271(f)(2) which imposes liability in connection with certain supplies of a singular "component." *Id.* at n. 5.

■ Considering the other components of the '283 Patent—the subsurface, sand, and the resilient particles, this Court cannot find that the plain meaning of § 271(f)(1) yields liability for infringement where only one component of four comprising the patent is supplied from within the United States.[24] *See Bristol–Myers*

*Squibb Co.,* 2001 U.S. Dist. LEXIS 16895 at *12 (supplying from the United States one component of a patented two-component chemical product did not rise to the level of a violation of § 271(f)(1)). Recognizing the tension between providing protection for patented inventions and avoiding extraterritorial effect of U.S. patent law, the Court is convinced that exporting a single component, here the pile fabric, of a patented invention abroad will not rise to the level of providing "a substantial portion of the patented invention."

■ Finally, 35 U.S.C. § 271(f)(2) creates liability for infringement if one supplies "any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial non-infringing use." 35 U.S.C. § 271(f)(2). To establish that the article is a staple article or commodity of commerce suitable for substantial non-infringing use, the plaintiff must have proof that the article has no use except in the patented invention. *See C.R. Bard, Inc.,* 911 F.2d at 674–75.

Plaintiffs suggest that there is no evidence to indicate that Southwest made any market overseas of the pile fabric as a "staple article," rather stating that the evidence reveals that the pile fabric was custom made by Defendant in the United States for overseas AstroPlay® installations and installed in at least 99 of 100 installations in Europe, all of which used an allegedly infringing sand and rubber

---

23. Courts have interpreted this language narrowly in order to avoid giving extraterritorial effect to otherwise domestic patent protection. *See Waymark Corp.,* 245 F.3d at 1368; *Bristol–Myers Squibb Co.,* 2001 U.S. Dist. LEXIS 16895 at *20.

24. Plaintiffs attempts to divide the pile fabric component into two parts, having previously treated the pile fabric as a single component

of the '283 Patent, are not well taken by this Court. In any event, where the two alleged elements are so intimately intertwined and distinct from the other stated elements as to have been previously construed by the parties as a single element of the invention, the Court finds that whether 1 of 4 or 2 of 5 elements are so provided it will not rise to the level of providing the requisite "substantial portion of the patented invention."

infill. Notwithstanding Plaintiffs' statements concerning the pile fabric's use in allegedly infringing sand and rubber infill installations, Plaintiffs have not contradicted Defendant's evidence that the "pile fabric" at issue was used in other non-infringing products as well, including those playing surfaces filled only with rubber particles in several countries and, interestingly, to department stores for use in window dressings to create the appearance of grass.[25] Plaintiffs demonstration that such pile is used in allegedly infringing fields abroad cannot alone create a violation of 35 U.S.C. § 271(f)(2) where Defendant has demonstrated other uses for the pile product that it supplies overseas. *See C.R. Bard, Inc.,* 911 F.2d at 674–75.

Having so decided, it will not be necessary for this Court to reach the issue of whether the installations overseas were, in fact, the patented invention of the '283 Patent. The foreign installations alleged to infringe the '283 Patent do not fall within the realm of protection afforded by U.S. patent law.

5. **Plaintiffs Lack Standing with Regard to Claims under the Kentucky Consumer Protection Act, KY. REV. STAT. 367.010**

■ Plaintiffs have alleged that Defendant participated in unfair competition in violation of the Kentucky Consumer Protection Act. KY. REV. STAT. 367.170.

KY. REV. STAT. 367.170(1) states that "[u]nfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." As stated in then-Chief Judge Henry Wilhoit's Order filed on October 6,

2001, KY. REV. STAT. 367.220(1) sets forth the standing requirements for such a Kentucky Consumer Protection Act claim under KY. REV. STAT. 367.170:

> Any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real, or personal, a result of the use or employment by another person of a method, act or practice declared unlawful by KY. REV. STAT. 367.010, may bring an action…

KY. REV. STAT. 367.220(1). Judge Wilhoit's order continues, "FieldTurf has not alleged privity with Southwest and is not a consumer for Kentucky Consumer Protection Act purposes." [October 6, 2002 Order at 11.] Accordingly, Plaintiff's claims pursuant to KY. REV. STAT. 367.010 will be dismissed with prejudice.

6. **Plaintiffs Have Failed to Provide Evidence Sufficient to Maintain the Remaining Causes of Action Under Kentucky Common Law**

■ Defendant also states that summary judgment is appropriate for Plaintiffs' claims of common law unfair competition, commercial disparagement and defamation[26], and tortious interference with economic relations. In their own way, these claims are Plaintiffs' catch-all claims with regard to Defendant's alleged behavior, relying on the proof underlying the other claims to make these actions lie.

■ "Unfair competition" at common law in Kentucky requires proof that the Defendant engaged in acts or practices

---

**25.** Further, as Defendant reminds the Court, inventor Haas has testified that the pile fabric was manufactured prior to the time Haas applied for his patent. This suggests, and Plaintiffs do not demonstrate otherwise, that the pile fabric is hardly a feature specific only to those fields constructed with '283 Patent technology.

**26.** Commonwealth common law does not recognize a separate cause of action for "commercial disparagement."

"for the purposes of pirating the trade of a competitor," such as misappropriation or misrepresentation, and such acts injured the plaintiff "by reason of the loss of business or impairment of good will." *Covington Inn Corp. v. White Horse Tavern, Inc.*, 445 S.W.2d 135, 138–39 (1969). No one has alleged that Southwest has attempted to misappropriate FieldTurf's goods, and the alleged misrepresentations by Southwest are nowhere to be found. Specifically, as stated hereinabove, FieldTurf has failed to state that statements made by Southwest are false or that any customers were deceived by said statements.

█ Similarly, the failure to demonstrate that statements made by Southwest's representatives are literally false for the purposes of the Lanham Act defeats any action on the part of Plaintiffs for defamation under Kentucky law. In order to demonstrate a claim, Plaintiffs would necessarily have to produce evidence that the allegedly defamatory language was not true, among other elements of the claim. *CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068, 1083 (W.D.Ky. 1995). Having failed to provide that evidence, the claim must also fail.

█ Finally, to successfully support a claim for tortious interference with economic relations at common law, Plaintiffs must demonstrate (1) the existence of a valid business relationship or expectancy, (2) Defendant's knowledge of that relationship or expectancy, (3) Defendant's intentional act of interference with that relationship or expectancy, (4) an improper motive, (5) causation, and (6) special damages. *CMI, Inc.*, 918 F.Supp. at 1080. It is taught in the Commonwealth that "it is clear that to prevail a party seeking recovery must show malice or some significantly wrongful conduct." *National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 859 (Ky.1988). Further, it is stated:

Kentucky courts have been very cautious in expanding unduly the tort remedies available to those in contractual relationships. There are sound reasons for this caution. The actual language of § 766A is so all encompassing and vague that to adopt it directly would cause tremendous confusion without creating a clear societal benefit. The conduct conceivably within its scope could be indistinguishable from the kind of unfettered commerce upon which courts have been reluctant to pass judgment. Moreover, the available remedies address the most direct and readily identifiable harms. The torts discussed in § 766A necessarily involve highly speculative damages. Parties to contracts have a full array of contractual remedies to resolve inequities of performance caused by third persons. The Court is not persuaded that this new tort is necessary to correct a glaring inequity among commercial parties. Finally, the kind of conduct which is theoretically actionable under this new tort may be of an entirely different quality and character than that found in this case. As examples of actionable conduct Haynes cites destroying building supplies, illegally preventing issuance of building permits, physical intimidation of employees or other kinds of physical interference. Haynes. *Kentucky Jurisprudence*, § 12–11 (1987).

*CMI, Inc.*, 918 F.Supp. at 1079 –1080.

█ Plaintiffs rely upon incidents surrounding the FieldTurf ® installation at the City of Lake Oswego to demonstrate Southwest's alleged interference with FieldTurf's business and contractual relations. It is unclear to this Court how providing its ASTM test results to the City of Lake Oswego—the act that seems to be the gravamen of Plaintiffs' argument—rises to the level of "significantly wrongful conduct," particularly in light of

this Court's analysis of such testing here-inabove with regard to the Lanham Act. Even assuming that Southwest did, as FieldTurf alleges, test the fields without permission. of the city or its consultants, Plaintiffs have failed to demonstrate that Defendant's trespass onto the city's property had the destructive quality—preventing something from taking place or destroying something—anticipated by Kentucky courts in recognizing torts of interference such as the one at bar. Having failed to demonstrate the necessary conduct by Southwest, Plaintiffs claim shall be dismissed.

## Conclusion

For the foregoing reasons, this Court finds that Plaintiffs have failed to demonstrate that "there is a genuine issue for trial." *Hall*, 128 F.3d at 422. Having so concluded, all of Plaintiffs' claims shall be dismissed with prejudice.

Accordingly, **IT IS ORDERED:**

(1) That the Defendants' Motion for Partial Summary Judgment [Record No. 342] be, and hereby is, **GRANTED;** and

(2) That the Defendants' Motion for Summary Judgment [Record No. 350] be, and hereby is, **GRANTED.**

## JUDGMENT

In accordance with the Order of even date and entered contemporaneously herewith,

**IT IS HEREBY ORDERED:**

(1) That this action be, and the same hereby is, **DISMISSED AND STRICKEN FROM THE ACTIVE DOCKET.**

(2) That all pending motions be, and the same hereby are, **DENIED AS MOOT.**

(3) That all scheduled proceedings be, and the same hereby are, **CONTINUED GENERALLY.**

(4) That this Order is **FINAL AND APPEALABLE and THERE IS NO JUST CAUSE FOR DELAY.**